No. 72,534

DARRELL W. BOULANGER, *Appellant,* v. DR. P. ALBERT POL and APPLEWOOD CARE CENTER, INC., *Appellees.*

(900 P.2d 823)

Opinion filed August 18, 1995.

*W. J. Fitzpatrick,* of Fitzpatrick & Bass, of Independence, argued the cause and was on the brief for appellant.

*Scott K. Logan,* of Logan and Logan, of Prairie Village, argued the cause and *Kate F. Baird,* of the same firm, was with him on the brief for appellee Dr. P. Albert Pol.

*Jeffrey W. Jones,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *Thomas L. Theis,* of the same firm, was with him on the brief for appellee Applewood Care Center, Inc.

*Wayne T. Stratton* and *David N. Harger,* of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* Kansas Medical Society.

The opinion of the court was delivered by

HOLMES, C.J.: This is an action for personal injuries sustained when Darrell W. Boulanger (plaintiff/appellant) was shot by Ron Hill 10 days after Ron was discharged from an intermediate health care facility. Plaintiff appeals from the decision of the trial court granting summary judgment to Dr. P. Albert Pol and Applewood Care Center, Inc. (defendants/appellees). Plaintiff argues the defendants were negligent in releasing Ron. Additionally, plaintiff argues the defendants assumed care of a dangerous person and had a duty to warn him of Ron's discharge or to detain and commit Ron. The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3017 and Kansas Supreme Court Rule 8.02 (1994 Kan. Ct. R. Annot. 46). We affirm.

The facts will be set forth in some detail. Darrell Boulanger is the uncle of Ron Hill. As a result of a brain injury sustained while a teenager, Ron has suffered from physical and mental disabilities. In the late 1980's, Ron became preoccupied with religion and believed plaintiff was the devil incarnate.

In November 1989, Ron drove to plaintiff's home and physically assaulted him. Following the incident, Ron voluntarily admitted himself to Coffeyville Regional Medical Center (CRMC) under the treatment of Dr. Cantwell. Almost two weeks later, he was discharged to his parents' care.

In February 1990, Ron was again voluntarily hospitalized at CRMC due to suicide threats. While at CRMC, Ron made no statements or threats toward plaintiff. Despite Dr. Cantwell's recommendation that Ron be placed in a structured environment, Ron

was discharged and returned to his parents' home. Several weeks later, Ron's father asked Ron to help move furniture to plaintiff's home. After assaulting his father, Ron attempted to stab himself. Following the incident, Ron was voluntarily admitted to CRMC for the third time. While at CRMC, Ron made no statements or threats toward plaintiff. On April 5, 1990, at Dr. Cantwell's suggestion, Ron was transferred to Applewood Care Center, Inc. (Applewood). Ron's admission to Applewood was voluntary.

At the time of his discharge from CRMC, Dr. Cantwell did not believe Ron was dangerous to himself or others if he took his medication and was in a structured setting. The purpose in transferring Ron to Applewood was to provide a structured environment away from home, daily medication monitored by a psychiatrist, and training in independent living skills. The eventual plan was for Ron to go to a special facility for victims of head injuries when space became available.

Applewood is an intermediate care facility for the mentally ill, but is not a mental health treatment center. Applewood provides residents a place to live, monitored medication, training in independent living skills, and a stable and structured environment. Applewood is not equipped to deliver intensive psychotherapy and does not accept dangerous residents.

Dr. P. Albert Pol, a psychiatrist, was Applewood's medical director and Ron's primary care physician during his stay at Applewood. Dr. Pol was an independent contractor of Applewood. Dr. Pol met with Ron once per month while he was at Applewood.

While at Applewood, Ron was monitored for evidence of continuing homicidal and suicidal ideation, but did not exhibit any such behavior. Ron never indicated an intention to harm plaintiff, his father, or himself, nor did he refer to his uncle as Satan. Further, Ron's parents did not report any threats of violence to plaintiff or Ron's father when he was home for visits. Ron told his mother during one visit that he loved plaintiff and would hug and kiss him if he could come home.

On August 10, 1990, either at the request of Ron and his parents, or upon Dr. Pol's own volition, Ron was discharged to the care of his parents. Dr. Pol was solely responsible for the discharge; Ap-

plewood was not involved in the discharge decision. Plaintiff's expert agreed that the nursing and paraprofessional staff of Applewood was not at any time in a position to decide that Ron needed to be committed.

Plaintiff became aware of Ron's violent tendencies after Ron attacked him in November 1989. On August 20, 1990, 10 days after Ron's discharge, plaintiff went out of town with Ron's father on business. Upon their return to the Hills' home, Ron's father invited plaintiff inside. Plaintiff was reluctant to enter because he knew Ron was back home and he wanted to avoid him. Despite his extreme reluctance, Ron's father persuaded him to enter. Ron visited with plaintiff awhile and left the room. Plaintiff became apprehensive and attempted to leave, but Ron's father insisted he stay, and a few minutes later, Ron returned with a shotgun and shot plaintiff.

Based on this incident, the State brought criminal charges against Ron for aggravated battery, and at trial a jury found him not guilty by reason of insanity. Plaintiff then brought a civil suit against numerous defendants, including CRMC and Dr. Cantwell. Plaintiff has settled with all defendants except Dr. Pol and Applewood.

Plaintiff asserted Dr. Pol and Applewood were negligent in releasing Ron. Additionally, plaintiff claimed the defendants had assumed care of a dangerous person and owed plaintiff a duty to warn of Ron's discharge and the dangers that created or, alternatively, to detain and commit Ron.

Following voluminous discovery, including at least a dozen depositions Dr. Pol and Applewood filed motions for summary judgment. The trial court granted the motions, and plaintiff has appealed. In ruling on the summary judgment motions, the trial court found the following facts and conclusions of law:

"1. This is a medical malpractice claim brought by plaintiff Darrell W. Boulanger, against Dr. Albert P. Pol [sic] and Applewood Care Center, Inc.

"2. Plaintiff Boulanger is the uncle of Ron Hill. Wilbur and Christine Hill are Ron's parents. The plaintiff was quite close to the Hills.

"3. Ron Hill, while a teenager, suffered a brain injury resulting from two separate motorcycle accidents and has had resulting physical and mental disabilities.

"4. In the middle-1980's, Ron Hill developed a delusion with respect to his uncle, plaintiff Darrell Boulanger, believing that he was Satan.

"5. Throughout the 1980's, plaintiff Boulanger and Ron Hill had occasional contact with no apparent difficulties in terms of physical acts, until November, 1989, when Ron Hill drove to his uncle's house and assaulted him.

"6. As a result of this altercation, Ron Hill was voluntarily hospitalized at Coffeyville Regional Medical Center under the care of Dr. Cantwell, formerly a defendant in this case.

"7. Ron Hill was subsequently dismissed to his home and was re-admitted in early 1990 after making threats concerning his sister.

"8. Ron Hill was treated again at Coffeyville Regional Medical Center by Dr. Cantwell and again dismissed to his home. No statements or threats were made during this stay by Ron Hill against plaintiff.

"9. Subsequently, on March 31, 1990, Ron Hill had an altercation with his father, in which he physically assaulted the father and superficially cut his own chest with a knife.

"10. As a result of this, Ron Hill was hospitalized again at Coffeyville Regional Medical Center again under the care of Dr. Cantwell. Again, no threats were made by Ron against plaintiff.

"11. At the suggestion of Dr. Cantwell, Ron Hill was transferred to Applewood in April, 1990.

"12. Ron Hill was transferred to Applewood to allow him to be in a structured environment and to assist him with his activities of daily living so as to allow him to live independently.

"13. It was not intended that Ron Hill would receive psychotherapy or mental health counseling at Applewood, as it was not designed to provide that type of care. Plaintiff's expert acknowledged these facts.

"14. Applewood is not a mental health treatment center. It is a nursing home in the category of an Intermediate Care Facility—Mental Health. Applewood has patients which suffer from some mental impairment, but Applewood is not equipped to engage in mental health treatment.

"15. Throughout his stay at Applewood, Ron Hill was monitored for evidence of continuing homicidal or suicidal ideation and the consistent observation was that he did not exhibit any such behavior.

"16. During his stay at Applewood, Ron Hill went home on several visits, and there was no indication given by the parents that Ron Hill's behavior while there showed any continuing homicidal or suicidal thoughts.

"17. Ron Hill's mother has testified in this case that when Ron was at home, he at various times expressed that he no longer felt ill will toward Darrell and that he would 'kiss' Darrell if his parents would agree to allow him to come home.

"18. Throughout his stay at Applewood Care Center, Inc., Ron Hill was a voluntary patient and was not in custody. Applewood did not accept dangerous patients.

"19. Ron Hill was discharged from Applewood on August 10, 1990, with prescriptions for medication, to the home of Wilbur and Christine Hill.

"20. Dr. Pol, either at the request of Ron Hill's parents and Ron himself, or on his own volition, determined that Ron Hill should be discharged. Applewood itself was not involved in the decision-making process about the discharge.

"21. Between April 5, 1990, and August 10, 1990, Ron Hill made no threats relative to Darrell Boulanger.

"22. Ron Hill had never been declared incompetent legally.

"23. From the information available to plaintiff's expert, Dr. Lacoursiere, he would not say that at any time the nursing or paraprofessional staff of Applewood were in a position to make a decision that Ron Hill needed to be committed.

"24. On August 20, 1990, Ron Hill shot his uncle, the plaintiff, Boulanger, with a shotgun.

### "CONCLUSIONS OF LAW

"1. Summary judgment is proper where there are no material questions of fact.

"2. Here there are no material questions of fact.

"3. I am persuaded that the view of each of the remaining defendants is correct:

A. Plaintiff has no standing to file this action.

B. The defendants had no duty to warn third parties of Hill's dangerous propensities.

C. The release by Dr. Pol and by Applewood of Hill was not negligent, as a matter of law.

D. Under the facts, neither Dr. Pol or Applewood had a duty to commit Mr. Hill.

E. Applewood was not a facility designed to protect anyone from patients.

"4. *Durflinger* and *McGee* both preclude the plaintiffs from recovery."

On appeal the plaintiff asserts three issues:

1. Does the cause of action for negligent release recognized in *Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d 86 (1983), apply to voluntary patients?

2. Do defendants have a duty to plaintiff under Restatement (Second) of Torts § 315 (1965)?

3. Do material issues of fact preclude summary judgment?

The basic theory of the plaintiff on appeal is that Dr. Pol and Applewood were negligent in releasing Ron Hill to the care and custody of his parents. The principal arguments in support of plaintiff's negligent release theory are that the defendants had a duty to legally commit Ron to involuntary treatment and care or to warn plaintiff of his release and that he was a danger to plaintiff.

Our standard of review and the general rules pertaining to summary judgment have been stated repeatedly. In *Kerns v. G.A.C.,*

*Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994), we summarized them as follows:

"The burden on a party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."

In addition to alleging material issues of fact exist, plaintiff presents two legal theories in support of his claim that the trial court erred in granting summary judgment against him. First, plaintiff argues the cause of action for negligent release recognized in *Durflinger v. Artiles*, 234 Kan. 484, applies to voluntary patients as well as involuntary patients. Plaintiff asserts the duty in *Durflinger* was based on the physician-patient relationship; thus, a cause of action for negligent release applies to both voluntary and involuntary patients. Alternatively, plaintiff urges this court to impose a duty on defendants based on the special relationship analysis in Restatement (Second) of Torts § 315.

Dr. Pol, Applewood, and *amicus curiae* Kansas Medical Society argue that the duty imposed in *Durflinger* is properly limited to those patients who have been determined to be a danger to themselves or others in an involuntary commitment proceeding and should not be extended to patients seeking voluntary treatment.

The record before us is voluminous, consisting of approximately 850 pages plus two exhibits. Unfortunately, of the dozen or more depositions taken during discovery, the parties have selectively culled individual pages for inclusion in the record. While various statements in these selected pages are relied upon to support the arguments and allegations of the parties, in most instances the context and overall impact of the statements is difficult, if not impos-

sible, to ascertain. As a result, the meager deposition testimony which has been included in the record is of questionable assistance at best.

A cause of action for negligent release was first recognized by the Kansas Supreme Court in *Durflinger*. Under the facts of that case, Bradley Durflinger was involuntarily committed to the state hospital after a court determined he was mentally ill. Bradley was later discharged from the hospital as being no longer in need of care or treatment. A week after his discharge, Bradley killed his mother and brother. Surviving family members brought a wrongful death action in federal court, alleging the hospital doctors negligently released Bradley. Following a jury verdict in favor of plaintiffs, defendants appealed to the United States Court of Appeals for the Tenth Circuit. This court accepted two certified questions, the following being relevant to this case:

"Would the Kansas Supreme Court recognize as a valid cause of action a claim which grew out of a negligent release of a patient who had violent propensities, from a state institution, as distinguished from negligent failure to warn persons who might be injured by the patient as the result of the release?" 234 Kan. at 485.

The defendants argued they should not be liable for their acts, even if negligent, because predicting the dangerousness of a mental patient is too difficult. If the court held otherwise, defendants asserted, their ability to function professionally would be crippled, and the civil rights of mentally ill persons would be jeopardized.

First, the *Durflinger* court reviewed fundamental negligence principles:

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. [Citation omitted.] An accident which is not reasonable to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. [Citations omitted.] In Kansas it is a fundamental rule actionable negligence must be based on a breach of duty. [Citations omitted.] *Robertson v. City of Topeka* [, 231 Kan. 358, 644 P.2d 458 (1982)], recognized a special relationship between certain persons could give rise to a duty. Whether a duty exists is a question of law. [Citations omitted.] Whether the duty has been breached is a question of

fact. [Citation omitted.] Further, whether there is a causal connection between the breached duty and the injuries sustained is also a question of fact. [Citation omitted.]

"In Kansas negligence is never presumed. *Blackmore v. Auer*, 187 Kan. 434, 440, 357 P.2d 765 (1960). This court in *Blackmore* commented it may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, as a result of which such other person suffers injury. 187 Kan. at 440. Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself. 187 Kan. at 440. An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation*; it is risk to another or to others within the range of apprehension. *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), 59 A.L.R. 1253. The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based. 187 Kan. at 441." 234 Kan. at 488-89.

The court then stated: "The particular area of the law of negligence with which we are concerned herein is that of medical malpractice." 234 Kan. at 489. And later in the opinion it stated: "Liability predicated upon negligent release of a patient committed to a mental hospital is a medical malpractice action." 234 Kan. at 491. The language categorizing the cause of action as one of "medical malpractice" was overly broad and has created some confusion. As noted by one writer:

"The court's characterization of *Durflinger* as a medical malpractice action is puzzling. One wonders if the court intended to limit *Durflinger* to its facts. As the court itself noted: '[A] physician is obligated *to his patient* under the law to use reasonable and ordinary care. . . .' The typical plaintiff in a medical malpractice action is the patient or someone acting in the patient's behalf. In *Durflinger*, the plaintiffs were family members of the patient, but that fact seemed irrelevant to the court's analysis. The court did not indicate whether a medical malpractice characterization would be equally applicable had the victims been total strangers rather than family members of the patient. A negligent release suit by a total stranger could hardly be considered a 'medical malpractice' action." Note, *Torts—Liability of Psychiatrists for Violent Acts Committed By Dangerous Patients-Durflinger v. Artiles*, 33 Kan. L. Rev. 403, 414 (1985).

Careful consideration of our language in *Durflinger* indicates that the court's references to medical malpractice were directed to the proof necessary to establish liability based upon ordinary negligence principles once a duty was shown to exist. This is borne out by the court's statement following a discussion of the duty of the physician in treating his or her patient: "The aforementioned standards for medical malpractice actions are applicable to an action for negligent release of a patient from a mental hospital." 234 Kan. at 492. Once a duty supporting a cause of action for negligent release is established, then the burden of proof to show a breach of that duty is based upon the standards applicable in a malpractice action. Our language in *Durflinger* to the effect that the cause of action was one of medical malpractice is disapproved.

In *Durflinger,* in determining whether a duty existed, the court recognized a cause of action, based upon the Kansas Treatment Act for Mentally Ill Persons, K.S.A. 59-2901 *et seq.* (Act), for the negligent release of an involuntary patient who had been committed under the Act. It is the plaintiff's position that the duty found in *Durflinger* was not based upon the Act but on the physician-patient relationship and therefore also applies to voluntary patients.

Resolution of this issue requires a review of the statutory scheme for the care and treatment of mentally ill persons existing at the time of the events in question. Although there have been some amendments, the applicable statutes are not materially different from those reviewed in *Durflinger* and in *Hokansen v. United States,* 868 F.2d 372 (10th Cir. 1989). A mentally ill person is one who "(1) [i]s suffering from a severe mental disorder to the extent that such person is in need of treatment; (2) lacks capacity to make an informed decision concerning treatment; and (3) is likely to cause harm to self or others." K.S.A. 59-2902(h). An involuntary patient is "a mentally ill person who is receiving treatment under order of a court of competent jurisdiction." K.S.A. 59-2902(d). A voluntary patient is "a person who is receiving treatment at a treatment facility other than by order of any court." K.S.A. 59-2902(r). Treatment is defined as "any service intended to promote the mental health of the patient and rendered by a qualified professional." K.S.A. 59-2902(p).

The admission and discharge requirements for voluntary and involuntary patients are different. "Any person may be admitted to a treatment facility as a voluntary patient when there are available accommodations and the head of the treatment facility determines such person is in need of treatment therein." K.S.A. 59-2905(a). A voluntary patient shall be discharged when the head of the treatment facility determines treatment is "no longer advisable," K.S.A. 59-2906, or within three week days of a patient's request for discharge, K.S.A. 59-2907(a). The Act does not prevent the filing of an application for determination of mental illness if a voluntary patient is refusing reasonable treatment efforts and is likely to cause harm to himself or herself or others if discharged. K.S.A. 59-2907(b). The statute, however, does not impose a duty to apply for involuntary commitment. On the other hand, when a person has been determined to be mentally ill, "the court shall order treatment for such person at a treatment facility." K.S.A. 59-2917(f). An involuntary patient shall be discharged when "no longer in need of treatment in the facility." K.S.A. 59-2924(c).

In finding that a cause of action for negligent release of an involuntary patient would be recognized, the court in *Durflinger* relied primarily on K.S.A. 1973 Supp. 59-2902, which provided:

"(1) The term 'mentally ill person' shall mean any person who is mentally impaired, except by reason of mental deficiency only, to the extent that he is in need of 'care or treatment' and who is or probably will become dangerous to himself or the person or property of others if not given 'care and treatment' and

(A) who lacks sufficient understanding or capacity to make responsible decisions with respect to his need for 'care or treatment,' or

(B) who refuses to seek 'care or treatment.' " See 234 Kan. at 491-92.

The court stated:

"The petition for commitment alleged Bradley was dangerous to himself or others. The petition was filed by his grandfather the day after Bradley had attempted to kill his grandparents. Clearly he was committed to the hospital because he was dangerous to other persons. The hospital was required to provide care or treatment for Bradley. The 'head of the hospital' was required to discharge Bradley when he was 'no longer in need of "care and treatment" ' (K.S.A. 1973 Supp. 59-2924), *i.e.*, no longer dangerous to himself or *others*. The three defendant-physicians were involved in the hospital team recommendation to the head of the hospital (hospital superintendent) that Bradley was no longer in need of care or

treatment, *i.e.* no longer dangerous to himself or others. The making of the recommendation by the physicians to discharge or retain Bradley as a patient was a basic part of their professional employment. This professional duty obviously was for the benefit of Bradley and the public. We find no rational basis for insulating this one aspect of professional service from liability for negligence occurring in the performance thereof." 234 Kan. at 492.

In *Durflinger*, Bradley was involuntarily committed after the court determined he was dangerous to himself or others. Under the statute, the head of the hospital was required to release Bradley when he was "no longer in need of care and treatment," which the court concluded occurred when Bradley was no longer dangerous to himself or others. While the court discussed the duty a physician owes to a patient under general negligence principles, the source of the duty owed to the public for negligently releasing a patient was the involuntary commitment statutes. No determination of whether a patient is dangerous to himself or herself or others is required to be made upon either admission or discharge of a voluntary patient. Nor is a physician statutorily required to seek commitment of a voluntary patient who requests discharge. A physician does not have a duty to a third party for the negligent release of a voluntary patient under the rule announced in *Durflinger*.

Although we have not had occasion to review *Durflinger* since its inception, the issue has been considered by the federal courts.

In *Hokansen v. United States*, 868 F.2d 372, the Tenth Circuit was asked to decide if the duty announced in *Durflinger* applied to voluntary patients. In *Hokansen*, Robert Garcia was voluntarily admitted to a veterans hospital. He was later released and placed on an outpatient treatment plan. After his release, Garcia shot several people. The surviving victim and representatives of the deceased victims brought suit against the United States, alleging the treating physicians negligently released Garcia from inpatient care. The federal district court held that *Durflinger* applied only to involuntarily committed patients, and plaintiffs appealed. Like the plaintiff in this case, the plaintiffs in *Hokansen* argued *Durflinger* should apply to voluntary as well as involuntary patients.

The court concluded that *Durflinger* applied only in cases of involuntary commitment under the statutes and was not applicable to release of voluntary patients. The court stated:

"The Kansas statutes provide for three classes of psychiatric patients. An 'involuntary' patient is defined as 'a mentally ill person who is receiving treatment under an order of a court of competent jurisdiction.' [K.S.A. 59-902(d).] . . . [A] 'voluntary' patient is 'a person . . . who is receiving treatment at a treatment facility other than by order of any court.' [K.S.A. 59-2902(r).]

". . . A voluntary patient may be admitted when the hospital supervisor determines 'such person is in need of treatment.' [K.S.A. 59-2905.] A voluntary patient may be released when the supervisor finds 'treatment . . . to be *no longer advisable.*' [K.S.A. 59-2906.] (emphasis added). Significantly, and in contrast to the case of involuntary patients, . . . the provisions for . . . voluntary admission, [and] discharge therefrom, [do not] require any finding that the patient is a 'mentally ill person,' *i.e.,* 'dangerous to self or others.' . . . That is the critical distinction. To support the existence of a duty in *Durflinger* the court specifically quoted [sic] upon the 'no longer dangerous to himself or others' determination that the hospital professionals are required to make under the involuntary commitment statutes, and it relied upon this determination to find a duty of care owing to 'the public.' [234 Kan. at 492.] No such determination was required under the Kansas statutes when the hospital released Garcia from treatment as a voluntary inpatient." 868 F.2d at 376-77.

The court also noted:

"A voluntary patient may request discharge, and a hospital is then required to release the patient within the next three days. [K.S.A. 59-2907.] . . . . Section 59-2907, however, does not impose any duty upon the hospital to seek commitment. It does not even suggest any criteria by which a hospital should decide whether or not to seek commitment. In any event, the statutory language at no point suggests any obligation by the hospital to third parties to exercise the power to seek commitment." 868 F.2d at 376-77 n.7.

The court then concluded: "We hold that *Durflinger* does not govern this case. No duty recognized by the Kansas Supreme Court in *Durflinger* supports a cause of action by the plaintiffs against the defendants." 868 F.2d at 377.

In 1990, the federal District Court of Kansas was faced with a reconsideration of whether, under Kansas statutes, there was a duty to detain a voluntary patient. In *Mahomes-Vinson v. United States,* 751 F. Supp. 913 (D. Kan. 1990), Nolan Prewett was a voluntary patient at the veterans hospital in Topeka. Prewett had a long history of sexual and physical violence and had received treatment at various hospitals for years. On July 19, 1986, eight days after he was discharged, Prewett raped, sodomized, and killed two little girls. The children's mother filed an action against the United

States. One of her claims brought under the Federal Tort Claims`
Act was based on the negligent release of Prewett. In granting
summary judgment to the defendant on that claim, the court
stated:

"The FTCA directs that the law of the state in which the act or omission resulting
in injury occurred be used to determine whether there is liability on the facts of
the particular case. [Citation omitted.] We will therefore apply the law of Kansas
in ascertaining whether the defendants owed plaintiff a duty.

. . . .

"Plaintiff alleges in the alternative that the United States, acting through the
Department of Veterans Affairs, is liable under the statutory and common law of
Kansas for the negligent release of Prewett as a voluntary patient at the VA hospital
in Topeka. The precise issue of whether a VA hospital has a duty under Kansas
law to prevent the release of a voluntary patient was the subject of a recent Tenth
Circuit opinion—*Hokansen v. United States*, 868 F.2d 372 (10th Cir. 1989). The
*Hokansen* plaintiffs relied upon the Kansas Supreme Court's decision in *Durflin-
ger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983) in arguing that treating physicians
at the VA hospital in Wichita, Kansas, negligently released a voluntary patient,
Robert Garcia. The Tenth Circuit noted that the duty found to exist in *Durflinger*
derived from Kansas' involuntary commitment statute. Since Garcia was a vol-
untary patient, the Tenth Circuit concluded in *Hokansen* that no duty was rec-
ognized in *Durflinger* to support plaintiff's cause of action.

"Plaintiff contends nonetheless that she has a viable cause of action because
the court in *Hokansen* was confronted with a different version of K.S.A. 59-2907
than was in effect at the time of Prewett's release. K.S.A. 1989 Supp. 59-2907
provides voluntary patients with the right to be discharged from a treatment fa-
cility within three days of their written request. An amendment in 1986 added
the following language to the statute:

'Nothing in this act shall prevent the head of a treatment facility or other
person from filing an application for determination of mental illness with re-
spect to a voluntary patient who is refusing reasonable treatment efforts and
is likely to cause harm to self or others if discharged.'

K.S.A. 1989 Supp. 59-2907. Plaintiff suggests that the legislature intended to en-
courage the involuntary commitment of voluntary patients by heads of treatment
facilities who believed that the patients would cause harm to themselves or oth-
ers." 751 F. Supp. at 917-18.

The amendment relied upon is the current version of the statutes
and is applicable to the case now before us. After carefully review-
ing the Kansas statutes and the history of recent amendments to
them, the court stated:

"We hold that the amendment of K.S.A. 59-2907 by the Kansas legislature in 1986 did not impose a duty on the defendant to apply for a determination of mental illness with regard to Nolan Prewett. The court will therefore grant defendants' summary judgment motion with regard to plaintiff's claim of negligent release." 751 F. Supp. at 919.

It is apparent that the court relied upon the holding and analysis of *Hokansen*.

We conclude that the duty recognized in *Durflinger* was based upon the statutory provisions applicable to the commitment and release of involuntary patients and is not applicable to voluntary patients. The cause of action for negligent release of an involuntary patient recognized in *Durflinger* does not apply to voluntary patients.

Next, plaintiff argues that if *Durflinger* did not recognize a cause of action for negligent release applicable to voluntary patients, then defendants owed him a duty under the special relationship doctrine set forth in Restatement (Second) of Torts § 315. Plaintiff asserts the defendants had a duty to warn him of Ron's discharge or seek Ron's commitment. On the other hand, Dr. Pol and Applewood argue no special relationship existed to justify imposition of a duty. Dr. Pol and *amicus curiae* argue a therapist does not have the requisite ability to control the conduct of a voluntary patient so as to justify imposition of a duty to control.

Sections 315-320 of the Restatement (Second) of Torts set forth the duty on a person to control the conduct of third persons.

"As a general rule, in the absence of a 'special relationship' there is no duty on a person to control the conduct of a third person to prevent harm to others. A special relationship may exist between parent and child, master and servant, the possessor of land and licensees, *persons in charge of one with dangerous propensities, and persons with custody of another.*" C.J.W. v. State, 253 Kan. 1, 7-8, 853 P.2d 4 (1993).

The relevant portion of the Restatement provides:

"§ 315. General Principle
"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
    (a) a special relation exists between the actor [psychiatrist] and the third person [patient] which imposes a duty upon the actor [psychiatrist] to control the third person's [patient's] conduct, or

(b) a special relation exists between the actor [psychiatrist] and the other [victim] which gives to the other [victim] a right to protection."

Because plaintiff alleges no relationship between plaintiff and defendants, § 315(b) is inapplicable. According to the comments to § 315, subsection (a) is also governed by § 319, which provides:

"Duty of Those in Charge of Person Having Dangerous Propensities
"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Kansas courts have recognized an affirmative duty to protect third persons from harm based on the special relationship analysis set forth in § 315. See *C.J.W. v. State*, 253 Kan. 1, 11-12. (State has duty to warn juvenile officials of child's known violent propensities and protect other children in custody from violent child); *Washington v. State*, 17 Kan. App. 2d 518, Syl. ¶ 2, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (prison officials owe duty of reasonable care to safeguard prisoners from attack by other prisoners; duty not violated unless danger was known or should have been known); *Cansler v. State*, 234 Kan. 554, 564, 675 P.2d 57 (1984) (State has duty to confine inmates securely and to notify area residents and law enforcement when inmates escape). In *Robertson v. City of Topeka*, 231 Kan. 358, 364, 644 P.2d 458 (1982), the court recognized a special relationship also exists when one who creates a foreseeable peril, not readily discoverable, fails to warn. Most recently, the court found a special relationship did not exist in *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993) (the University did not have type of custody or control over students contemplated by § 315 to establish a special relationship), and *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 833, 877 P.2d 430 (1994) (no duty of State to prevent child abuse in private, licensed child care center because State had not created the peril and special relationship did not exist). It must be conceded that all of the foregoing cases are fact specific, and the results reached were dictated by the facts in each case.

Assuming, without deciding, that § 315 might be applicable under certain circumstances to the relationship between a psychiatrist

and/or a mental health care facility and a voluntary patient, the facts in this case do not support the existence of the duty alleged by plaintiff. Ron Hill was a voluntary patient of Dr. Pol and Applewood and was free to terminate his relationship with Dr. Pol and to leave Applewood at any time unless detained pursuant to K.S.A. 59-2903. Ron was referred to Dr. Pol and Applewood by the CRMC and Dr. Cantwell to provide Ron with a structured environment away from home, daily medication monitored by a psychiatrist, and training in independent living skills. He was not referred for intensive psychotherapy or psychiatric treatment, and Applewood and Dr. Pol were not expected to provide such care and treatment. At the time of Ron's discharge from Applewood on August 10, 1990, plaintiff was well aware that Ron had been a threat to him in the past and was capable of violence. On the day of the attack, August 20, 1990, plaintiff voiced his concern about Ron and was reluctant to enter the Hills' home. However, his brother-in-law, Ron's father, insisted, and plaintiff, against his better judgment, entered the house knowing Ron was there and that a potential for violence existed. After conversing briefly with Ron and his father, plaintiff observed Ron leave the room, and at that time plaintiff became even more apprehensive. Again, plaintiff tried to leave the Hill house but was convinced not to do so by Ron's father. Plaintiff was well aware at all times of the potential for danger but failed to take any action to avoid the ultimate attack by Ron.

Plaintiff contends the defendants had a duty under § 315 to involuntarily commit Ron or, in the alternative, warn him of Ron's release and potential for violence. We have already determined that defendants had no statutory duty and no duty under *Durflinger* which would establish liability for the alleged negligent release of Ron.

Kansas courts have not addressed whether the relationship between a psychiatrist and a voluntary patient creates an affirmative duty for the benefit of third persons. In *Durflinger*, the court specifically distinguished negligent release from other types of third-party actions based on § 315 and requiring the physician to take some affirmative action to protect third persons, such as notifying

a potential victim, calling the police, or instituting commitment proceedings. 234 Kan. at 492-93. In making the distinction and in further addressing defendants' policy concerns, the court quoted extensively from *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185 (D. Neb. 1980), which discusses *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), and *McIntosh v. Milano*, 168 N.J. Super. 466, 403 A.2d 500 (1979).

*Tarasoff* is the landmark case addressing the duty of a psychiatrist to protect others from the conduct of a patient. In *Tarasoff*, Prosenjit Poddar killed Tatiana Tarasoff. Two months earlier, Poddar had informed his therapist while in voluntary outpatient treatment that he intended to kill Tatiana. Although Poddar did not specifically state Tatiana's name, she was readily identifiable by the therapist. Tatiana's parents brought suit against the therapists and hospital, alleging they had a duty to warn their daughter of the impending danger. The court found that even though Poddar was a voluntary patient, a duty existed under § 315. *Tarasoff* and *Lipari* are quoted and discussed at length in *Durflinger* and, although interesting, we see no reason to repeat that discussion here as there was no attempt in *Durflinger* to rely upon § 315 or to consider its application to either an involuntary or voluntary patient. To the contrary, the court stated:

"[T]here is no reason to apply the concept of special relationship and the resulting affirmative duty to take some special step to protect a third party or the public. We are not called upon in this case to decide whether, in Kansas, liability may be predicated upon a therapist's failure to warn a victim or failure to detain based upon a special relationship and, accordingly, decline to decide such issues in this opinion." 234 Kan. at 499.

Plaintiff, relying on a special relationship under § 315, argues defendants had a duty to detain Ron and seek his involuntary commitment or warn plaintiff of the danger. Plaintiff's expert believed Ron was dangerous to himself or others at the time of his discharge. In his report, he opined Dr. Pol's negligent treatment of Ron included the "failure to adequately prepare the patient and family for discharge and evaluate the patient at discharge if such discharge

was appropriate, or notify or warn plaintiff had the patient been evaluated and found still dangerous to him."

Plaintiff argues Dr. Pol had a duty to warn him of Ron's discharge. However, the uncontroverted facts establish plaintiff was fully apprised of the danger posed by Ron. The duty to warn does not arise when the victim already knows of the danger. *Matter of Estate of Votteler*, 327 N.W.2d 759, 762 (Iowa 1982); *Hinkelman v. Borgess Med. Cen.*, 157 Mich. App. 314, 323-24, 403 N.W.2d 547 (1987); *Wagshall v. Wagshall*, 148 App. Div. 2d 445, 447, 538 N.Y.S.2d 597 (1989). This conclusion is also supported by *Robertson*, 231 Kan. at 364, where the court recognized a special relationship exists when one creates a foreseeable peril, *not readily discoverable*, and fails to warn of the danger. In *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, *clarified and reh. den.* 187 Kan. 186, 354 P.2d 670 (1960), a patient brought a malpractice action against his physician, and one of the allegations was that the doctor failed to fully advise plaintiff of the possible results of radiation therapy. The court discussed at some length the duty to warn or advise a patient. In doing so, the court recognized that "where the patient fully appreciates the danger involved, the failure of a physician in his duty to make a reasonable disclosure to the patient would have no causal relation to the injury." 187 Kan. at 410. The same reasoning applies in the present case. Plaintiff was fully cognizant of Ron's feelings toward him and Ron's propensity for violence. Under the circumstances, defendants had no duty to warn plaintiff of what he already knew.

Because Dr. Pol had no duty to warn plaintiff, the next question is whether there is evidence to support plaintiff's contention that Dr. Pol alternatively had a duty to seek Ron's involuntary commitment. Plaintiff's expert believed plaintiff should have been warned if Dr. Pol determined Ron was dangerous to plaintiff. Other than the general statement by plaintiff's expert that Ron was dangerous to himself or others upon discharge, there is nothing in the record that indicates the circumstances required Dr. Pol to seek Ron's commitment *instead of* simply warning plaintiff. Plaintiff provides no evidence that Ron's involuntary commitment was necessary if plaintiff was already apprised of the danger.

Under the facts of this case, because plaintiff was aware of the danger, Dr. Pol had no duty to take any affirmative action to control Ron even if a special relationship under § 315 had been established. Furthermore, defendants did not have the requisite control of Ron which might conceivably create a duty under § 319.

Finally, plaintiff asserts the trial court committed error in granting summary judgment because there were disputed material facts which precluded summary judgment. We have carefully reviewed each of plaintiff's disputed facts and, in view of our holding on the first two issues, none of them are material to our decision. "In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case." *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994).

In conclusion, we hold: (1) The cause of action for negligent release of an involuntary mental patient recognized in *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), is inapplicable to, and does not create a cause of action for, the alleged negligent release of a voluntary patient; (2) the duty to warn does not arise when the victim already knows the danger; (3) under the facts of this case, no special relationship exists which would warrant a duty being imposed under Restatement (Second) of Torts § 315; and (4) there are no material disputed facts which precluded summary judgment in this case.

Affirmed.