(908 P.2d 184)

No. 72,817

No. 73,062

KENNETH C. CALWELL, *Appellant*, v. RIZWAN U. HASSAN, M.D.,
*et al.*, *Appellees*.

JOSEPH W. (TREY) HALL, *Appellant*, v. RIZWAN U. HASSAN, M.D.,
*Appellee*.

Opinion filed December 15, 1995.

*Nicholas S. Daily*, of Depew and Gillen, L.L.C., of Wichita, for the appellants.

*James Z. Hernandez*, of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, for the appellee.

Before GREEN, P.J., PIERRON, J., and RICHARD W. WAHL, District
Judge Retired, assigned.

PIERRON, J.: This is a personal injury/medical malpractice case
where appellants, Kenneth C. Calwell and Joseph W. (Trey) Hall,
were injured in an automobile/bicycle head-on collision. Appellants
sued Sharon K. Rylant, the driver of the automobile, and Dr. Riz-
wan U. Hassan, Rylant's treating physician. Rylant had been a pa-
tient of Hassan since 1988 for what she described as a problem of
falling asleep during the day. Appellants appeal the district court's
granting of summary judgment in favor of Hassan that found (1)
Hassan had no duty to advise Rylant not to operate a motor vehicle,
(2) there was no causal connection between the failure to meet
that duty by Hassan and the accident, and (3) the factual matters
did not rise to the level of evidence sufficient to support appellants'

position or to create a factual dispute dealing with either medically inappropriate treatment of Rylant or failure to advise her of the potential adverse effects of medication, mainly drowsiness. We reverse.

On August 8, 1991, at approximately 6:15 a.m., appellants were seriously injured when a car driven by Rylant crossed the center line and struck them as they rode their bicycles. Rylant was driving to work for her 7 a.m. to 3:30 p.m. shift.

Appellants filed suit for injuries and damages, alleging that Rylant fell asleep and negligently allowed her vehicle to cross the center line. In a second count of the lawsuit, appellants alleged a claim against Hassan for failing to appropriately treat Rylant's sleep disorder, failing to appropriately monitor her medication, and failing to advise her not to operate an automobile given her medical condition and prescribed medication.

Appellant Hall later dismissed his claims and filed a separate suit alleging the same claims previously raised in the suit with appellant Calwell, but listing Hassan as the only defendant. The two lawsuits were consolidated for purposes of discovery and trial.

Rylant began seeing Hassan, a neurologist, in June 1988, because she felt drowsy and fell asleep during the daytime. Hassan's consultation report stated that his impression was Rylant had Disorder of Excessive Sleep (DOES) and that he had ruled out narcolepsy. Hassan performed a variety of tests on Rylant and discovered she had more than normal rapid eye movement (REM) sleep, which prevented her from achieving sufficient deep or slow wave sleep. Hassan's interpretation of the test results confirmed his impression that Rylant had a condition comparable to DOES, and again he ruled out narcolepsy.

After testing and diagnosing Rylant, Hassan prescribed Elavil for her to take at bedtime. He stated the drug was to relax her so she could achieve deeper sleep. Elavil accomplishes this by suppressing REM sleep, providing a deeper sleep.

The effectiveness of the Elavil decreased over time, and Hassan increased Rylant's dosage from 25 mg to 50 mg per dose on August 10, 1988. Rylant stated that after she started taking Elavil and also after the dosage was increased, she had no problem staying alert

when driving. When the Elavil began to lose its effectiveness again, Hassan increased the dosage to 75 mg on November 10, 1988, and to 100 mg on June 1, 1989.

Approximately a year later on July 31, 1990, Rylant returned to Hassan complaining of inability to sleep at night, drowsiness, and the ability to sleep anytime during the day. Rylant also seemed to be depressed. Rylant stated in her deposition that she had not returned to see Hassan for a year because the Elavil was working. In addition to the already prescribed 100 mg dosage of Elavil, Hassan prescribed Prozac for Rylant's depression. After a follow-up appointment 3 weeks later, Rylant did not return for approximately another year.

Rylant testified she was feeling fine and had no problems between August 22, 1990, and July 29, 1991. When she returned to Hassan in July 1991, she complained of fighting sleep and dozing off at work. Hassan told her to abstain from caffeine and sugar, and continued the prescriptions and current dosages of Elavil and Prozac.

Rylant called Hassan after the accident. She told Hassan she had slept well the night before the accident and had not been drowsy when she left home for work. However, for the week prior to the accident, she had experienced dizziness and vertigo. In appellants' motion opposing summary judgment, they state that Rylant does not recall complaining to Hassan about dizziness or vertigo. When questioned about this in her deposition, Rylant stated, "That's what I read. I didn't remember that but that's what it says." As to her recollection of the accident, Rylant testified that immediately prior to the accident, she felt drowsy and then fell asleep. Rylant stated she awoke after she felt the impact of the accident.

It is uncontested that Hassan never warned Rylant not to drive. However, the record indicates, in the form of Hassan's medical report, that Rylant told him on June 21, 1988, that she had to fight to stay awake while driving. Hassan testified that Rylant never told him at any of her appointments that she had ever fallen asleep while driving, as she had done at work, nor that she could not stay awake while driving. For these reasons, Hassan stated he did not feel it was necessary to warn her not to drive.

On September 15, 1994, the district court heard arguments on Hassan's motion for summary judgment. The motion was granted.

The court held that the heart of the dispute was whether Hassan had a duty to the driving public to advise Rylant not drive her vehicle. The court did not find any Kansas cases on point, but cited *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), as instructive. The district court made the following findings:

"Rylant went to Hassan first on June 21, 1988, more than three years before the accident subject of this action. Her complaint was '. . . a problem she had falling asleep during the day.' Hassan completed a variety of testing to determine Rylant's daytime drowsiness. The result of the testing ruled out narcolepsy. Hassan prescribed Elavil for Rylant to take at night to relax her so she could fall into a deeper sleep and be more rested during the day. While plaintiffs acknowledge those facts, plaintiffs assert Rylant had a related condition, D.O.E.S., a sleep disorder. It appears to the Court the evidence shows D.O.E.S. is a sleep disorder, the principal category of same being narcolepsy. Plaintiff lacked the symptoms for narcolepsy and the other major category of D.O.E.S., cataplexy. Various experts seem to want to place Rylant in a minor sub-category of D.O.E.S., all physicians agreeing she had some unusual problem with sleeping and drowsiness during the daytime. Rylant had only one experience of going to sleep while driving, that being the incident in which she collided with the plaintiffs. She had other experiences, particularly at earlier times in the treatment, and before treatment, of falling to sleep while doing her job at work. Rylant also has testified she understood it would be only 'common sense' when she felt drowsy while driving to pull over to the side and stop. When the incident occurred giving rise to these claims, Rylant remembered negotiating road construction barriers at Harry Street, thereafter becoming drowsy, and going to sleep, crossing the center line and striking plaintiffs near Bailey, less than half a mile from Harry Street."

The court determined that as a matter of law, *Durflinger* did not go so far as to recognize a claim appellants could assert against Hassan.

The district court also held that even if it was error to not find a duty, there was, as a matter of law, no causal connection between the failure to meet that duty by Hassan and the accident. The district court based this conclusion on its finding that: (1) Rylant knew she had a problem staying awake during the daytime; (2) she understood to pull over to the side of the road if she felt drowsy; (3) her testimony that she would not have driven if warned by Hassan was self-serving and not legally impressive; (4) the accident

would have occurred with or without Hassan's advising Rylant not to drive; and (5) Hassan's advising Rylant of what she already knew would have been redundant, accomplishing nothing and too scant a connection for negligence liability.

With regard to the medication prescribed by Hassan, the district court found after examining all the evidence, including medical testimony and evidence, that Hassan did not deviate "from standard medical care in the administration of either Elavil or Prozac." The court concluded the factual matters presented did not rise to the level of evidence sufficient to support appellants' position or to create a factual dispute dealing with either medically inappropriate treatment of Rylant or failure to advise her of the potential adverse effects of the medication, mainly drowsiness.

Hassan argues preliminarily that this court is without authority to decide whether he had a duty to appellants. He argues that appellants failed to address the second, independent basis for the district court's award of summary judgment. The district court stated:

"Even if this Court is in error in predicating the action of the Supreme Court as just indicated [citing discussion of *Durflinger*, 234 Kan. at 488], the claims of plaintiff against Hassan conclude for another reason. Even if the duty plaintiff claims exists, there is, as a matter of law, no causal connection between the failure to meet that duty by Hassan and the accident."

This court's review of the granting of a motion for summary judgment is well settled.

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

Appellants contend the district court granted summary judgment despite five disputed facts. First, they contend the type of sleep disorder Rylant was diagnosed with is disputed. Hassan testified that his diagnosis was DOES and that he had ruled out narcolepsy. However, appellants state that: (1) Rylant believed she was a borderline narcoleptic; (2) their expert witness, Dr. White, testified Rylant probably had idiopathic hypersomnolence, a form of DOES, and he was uncertain whether she was narcoleptic; and (3) Hassan's expert witness, Dr. Dysart, testified she disagreed with Dr. White's diagnosis and Rylant suffered from hypersomnolence, secondary to a mood disorder.

Second, appellants contend it was disputed whether Rylant should have been advised not to drive. The resolution of this argument goes to the very heart of the matter and ultimately the question on appeal.

Third, appellants state it is disputed whether Rylant should have been able to anticipate losing consciousness. They cite: (1) Hassan's testimony that Rylant could lose consciousness at any time or without warning; (2) Dr. Dysart's testimony that Rylant might well have an irresistible urge to go to sleep during the day; and (3) Rylant knew she should pull over if she could not stay awake.

Fourth, appellants allege it was disputed whether Hassan prescribed the proper drugs for Rylant's condition. Dr. White testified that Hassan's course of treatment was inappropriate and he should have prescribed stimulants. Dr. Dysart testified that although he would not have prescribed Elavil, he did not think it was inappropriate. Appellants also point out that Dr. Dysart testified he would not have prescribe Prozac to a person with a sleep disorder because it might cause insomnia and exacerbate the condition. However, Dr. Dysart was basing his opinion on the assumption that Rylant took Prozac at bedtime. Hassan testified he had prescribed Prozac to be taken in the morning. Appellants also contend the district court determined a disputed issue of material fact by holding there was no medical testimony or evidence that Hassan deviated from standard medical care in the administration of either Elavil or Prozac.

Finally, appellants apparently contend it was disputed whether Rylant would have stopped driving had she been warned not to. Appellants cite both Rylant's and her husband's testimony that if Hassan had told her not to drive, she would have stopped because her husband was available and willing to drive her to work.

Appellants argue that Hassan breached his duty owed to Rylant, and given the foreseeable dangerous nature of her condition, to the general public as well. As a result, if injuries to appellants were caused or contributed to by this breach, they are entitled to pursue this action. Hassan asserts there was an absence of evidence to support appellants' case and the district court properly granted Hassan's motion for summary judgment.

In order to prevail in a medical malpractice action in Kansas, a plaintiff must prove the following three elements: "(1) that a duty was owed by the physician to the patient; (2) that the duty was breached; and (3) that a causal connection existed between the breached duty and the injury sustained by the patient." *Wozniak v. Lipoff*, 242 Kan. 583, 587, 750 P.2d 971 (1988). In ordinary negligence actions, the Supreme Court has noted: "For negligence to exist there must be a duty and a breach thereof before the conduct becomes actionable. If no duty exists there can be no negligence." *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, Syl. ¶ 5, 662 P.2d 243 (1983).

As previously discussed, the existence of a duty is a question of law, but the breach and causation issues are questions of fact for the trier of fact to resolve. *Durflinger*, 234 Kan. at 488. "Summary judgment is proper where the only question or questions presented are questions of law. [Citation omitted.]" *Fletcher v. Nelson*, 253 Kan. 389, 391, 855 P.2d 940 (1993).

Hassan states that before liability can be found on his part, appellants must show that by virtue of his treatment of Rylant, he owed a duty to the general public to keep the streets safe. Hassan argues there is no such duty. Rather, he contends he had only the duty to his patient, Rylant, to use skill and care in her treatment and that in no way could he have a duty to protect appellants from Rylant's driving.

The court in *Schrader v. Great Plains Electric Co-op, Inc.*, 19 Kan. App. 2d 276, 278, 868 P.2d 536 (1994), discussed the creation of a duty.

> "In negligence cases, 'duty' has been defined as 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' Prosser and Keeton on Torts § 53, p. 356 (5th ed. 1984). An act is wrongful, or negligent, only if a prudent person would perceive the risk or damage. The risk to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. The existence of negligence in a given case will depend upon the particular circumstances which surround the parties at the time of the occurrence on which the controversy is based. [Citations omitted.]"

In our effort to resolve the question of whether Hassan owed a duty of care to these third-party plaintiffs, we are guided by decisions of the courts of this state and decisions from other jurisdictions which have considered the issue of liability to a third party. The district court in the present case cited *Durflinger* as the closest Kansas case on point. Appellants rely on *Durflinger* for authority that the establishment of a duty is a question of law, and when a patient's condition threatens the safety of others, a physician may owe a duty not only to the patient but to the public.

In *Durflinger*, Brad Durflinger was adjudged to be a mentally ill person, expressing a passive-aggressive personality with sociopathic tendencies, and was ordered to be given care and treatment at the Larned State Hospital. Four months after his admittance, he was discharged as being no longer in need of care or treatment. Durflinger's grandparents picked him up at the hospital, and a few days later put him on a plane to Oregon to reside with his parents and siblings. A week after his discharge, Durflinger brutally murdered his mother and younger brother. Durflinger's family filed a wrongful death action claiming the doctors at Larned were negligent in releasing Durflinger. The jury returned a verdict in favor of the plaintiffs.

The defendants appealed to the Tenth Circuit Court of Appeals claiming, in part, that they could not be held liable because any duties they owed were to the patient and not to the plaintiffs. The

Tenth Circuit, in turn, certified the following question to the Kansas Supreme Court:

"WOULD THE KANSAS SUPREME COURT RECOGNIZE AS A VALID CAUSE OF ACTION A CLAIM WHICH GREW OUT OF A NEGLIGENT RELEASE OF A PATIENT WHO HAD VIOLENT PROPENSITIES, FROM A STATE INSTITUTION, AS DISTINGUISHED FROM NEGLIGENT FAILURE TO WARN PERSONS WHO MIGHT BE INJURED BY THE PATIENT AS THE RESULT OF THE RELEASE?" 234 Kan. at 487.

The *Durflinger* court answered the question in the affirmative. The court held that when liability is predicated on the negligent release of a patient from a mental hospital, general rules of negligence and medical malpractice control. The court stated there was no reason to apply the concept of a "special relationship" found in Restatement (Second) of Torts § 315 (1964), and the resulting affirmative duty to take some special step to protect a third party or the public. 234 Kan. at 499. The court expressly limited its decision by declining to decide whether, in Kansas, liability may be predicated upon a therapist's failure to warn a victim or failure to detain based upon a special relationship. In *Boulanger v. Pol*, 258 Kan. 289, Syl. ¶¶ 1, 2, 900 P.2d 823 (1995), the Supreme Court reiterated its recognition of a cause of action for negligent release of an involuntary patient from a mental hospital, but it disapproved of language in *Durflinger* that similarly allowed an action for medical malpractice.

Appellants contend that in extending a duty to nonpatients, other courts have focused on the broader principle that doctors, because of their special standing and relationship with their patients, have a duty to exercise reasonable care to protect third persons against foreseeable risks emanating from the patient's condition.

Hassan contends that if the court finds that the doctor-patient relationship created a "special relationship" under § 315 and that he had a duty to warn the general public, it would wreak havoc on doctors throughout Kansas and open them up to liability for everything their patients do.

Appellants' claim that the duty based on an alleged "special relationship" is derived from the Restatement (Second) of Torts § 315, which provides:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Comment (c) to § 315 explains:

"The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320."

"A special relationship may exist between parent and child, master and servant, the possessor of land and licensees, persons in charge of one with dangerous propensities, and persons with custody of another. Restatement (Second) of Torts §§ 316-320 (1964)." *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 (1991).

Kansas recognizes liability under Restatement (Second) of Torts § 315. In *Boulanger v. Pol*, 258 Kan. at 304, the court reiterated:

"Kansas courts have recognized an affirmative duty to protect third persons from harm based on the special relationship analysis set forth in § 315. See *C.J.W. v. State*, 253 Kan. 1, 11-12. (State has duty to warn juvenile officials of child's known violent propensities and protect other children in custody from violent child); *Washington v. State*, 17 Kan. App. 2d 518, Syl. ¶ 2, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (prison officials owe duty of reasonable care to safeguard prisoners from attack by other prisoners; duty not violated unless danger was known or should have been known); *Cansler v. State*, 234 Kan. 554, 564, 675 P.2d 57 (1984) (State has duty to confine inmates securely and to notify area residents and law enforcement when inmates escape). In *Robertson v. City of Topeka*, 231 Kan. 358, 364, 644 P.2d 458 (1982), the court recognized a special relationship also exists when one who creates a foreseeable peril, not readily discoverable, fails to warn. Most recently, the court found a special relationship did not exist in *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993) (the University did not have type of custody or control over students contemplated by § 315 to establish a special relationship), and *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 833, 877 P.2d 430 (1994) (no duty of State to prevent child abuse in private, licensed child care center because State had not created the peril and special relationship did not exist). It must be conceded that all of the foregoing cases are fact specific, and the results reached were dictated by the facts in each case."

In *Thies v. Cooper*, 243 Kan. 149, 151, 753 P.2d 1280 (1988), the Kansas Supreme Court recognized:

"It is the general rule that an actor has no duty to control the conduct of a third person to prevent that person from causing harm to others unless a 'special relationship' exists between the actor and the third party or the actor and the injured party. Restatement (Second) of Torts § 315 (1964)."

Both parties on appeal cite the case of *Mahomes-Vinson v. United States*, 751 F. Supp. 913 (D. Kan. 1990), as supporting authority. In *Mahomes-Vinson*, the mother of 3- and 6-year-old daughters who were raped, sodomized, and killed by a Veterans Administration hospital psychiatric patient brought an action under the Federal Tort Claims Act. The mother alleged a claim of negligent release, and pursuant to Restatement (Second) of Torts § 315, a claim of the defendant's failure to control the patient. 751 F. Supp. at 915-16. Appellants utilize *Mahomes-Vinson* to demonstrate a case where doctors have been held liable to a class of persons to whom the patient posed an unreasonable risk.

Hassan, on the other hand, contends appellants overlooked a significant principle of the special relationship rule. Specifically, that the rule was established as an exception to the general rule that ordinarily there is no duty to control the conduct of another in order to protect a third person from harm. In order to activate § 315, the situation must be a special relationship between two persons which gives the one a definite control over the actions of another. *Mahomes-Vinson*, 751 F. Supp. at 919. Hassan argues that is not appellants' claim.

Appellants contend there is a duty to warn when the foreseeable risk is to the driving public. They argue a majority of the courts which have addressed the question have held that if a doctor knows or should have known that his patient's condition might impair his or her ability to drive, the physician has an obligation to warn the patient. We are most persuaded by two cases cited by appellants: *Duvall v. Goldin*, 139 Mich. App. 342, 362 N.W.2d 275 (1984), and *Myers v. Quesenberry*, 144 Cal. App. 3d 888, 193 Cal. Rptr. 733 (1983).

In *Duvall*, the plaintiffs were injured when their vehicle was struck by a vehicle driven by an individual who had had previous epileptic seizures. The plaintiffs sued the individual's physician, Goldin, alleging he should have known that his patient, Hubbard, suffered from seizures. They alleged that as his physician, Goldin had a duty to persons operating motor vehicles on the public highways to properly care for and treat his patient. The plaintiffs contended that Goldin breached that duty by failing to prescribe or continue the patient on anti-epileptic medication and in failing to instruct him not to operate a motor vehicle after removing him from the anti-epileptic medication. 139 Mich. App. at 345-46.

The *Duvall* court discussed the general principles of negligence and focused on the creation of a duty. The court cited *Davis v. Lhim*, 124 Mich. App. 291, 335 N.W.2d 481 (1983), and *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), concerning threats of violence to a foreseeable and identifiable third party, as instructive to establishing the existence of a "special relationship" between Goldin and his patient.

"While *Davis* was factually limited to such a situation, we do not read that case as precluding the recognition of a special relationship and, therefore, the imposition of a duty in a somewhat broader context. It is not disputed that defendant and Hubbard had a doctor-patient/psychiatrist-patient relationship or that defendant was engaged in the treatment of Hubbard at the time of this accident. Thus, contrary to the trial court, we find that defendant did in fact have a special relationship with his patient, the so-called "dangerous person", which we believe is sufficient to place this case within the exception to the common-law rule that no one has a duty to protect an individual who is endangered by the conduct of another. Where the actor stands in a special relationship with *either* the third-party victim or the person causing the injury, a duty of reasonable care may arise. See 2 Restatement Torts, 2d, § 315, p 122; [citations omitted.]" 139 Mich. App. at 350-51.

Directly applicable to the case at bar, the *Duvall* court made an express finding as to foreseeability of injuries resulting from the doctor's failure to warn his patient not to drive. The court stated:

"Given the nature of the condition involved in the present case, epileptic seizures, and assuming as we must the truth of the plaintiffs' allegations, we are of the opinion that it is foreseeable that a doctor's failure to diagnose or properly

treat an epileptic condition may create a risk of harm to a third party. . . . Here, one of the alleged breaches of duty involves the defendant's failure to inform his patient not to operate a motor vehicle. The likelihood of injury to a third party due to an automobile accident arising from that breach is not so rare or unusual an occurrence as to be considered unforeseeable." 139 Mich. App. at 352.

The *Duvall* court also addressed arguments similar to Hassan's concerning the opening of a Pandora's box if this court recognizes a special relationship and/or a duty.

"We decline to find a duty in every instance involving a physician, his patient and an unidentifiable third party. We do not intend to make physicians highway accident insurers. Further, even though defendant *may* have failed to instruct Hubbard not to drive, Hubbard, too, *may* have been negligent in resuming driving without the express consent of his physician, or in otherwise failing to recognize the danger of driving without medication." 139 Mich. App. at 352.

The court in *Myers* also found a "special relationship."

"A 'special relationship' exists between a doctor and a patient. [citing *Tarasoff*] 'Such a relationship may support affirmative duties for the benefit of third persons. Thus, for example, a hospital must exercise reasonable care to control the behavior of a patient which may endanger other persons. A doctor must also warn a patient if the patient's condition or medication renders certain conduct, such as driving a car, dangerous to others.' [Citations omitted.]" 144 Cal. App. 3d at 892.

Appellants also cite a string of cases recognizing a physician's duty to warn identifiable third parties about the spread of infectious or contagious diseases. Hassan correctly argues these cases are distinguishable because they regard the failure of a physician to advise or for having incorrectly advised identifiable third parties of the risks of contracting a contagious disease. The issue in the present case is not the failure of Hassan to warn the plaintiffs, but his alleged negligence in failing to warn Rylant. See *Gammill v. United States.* 727 F.2d 950 (10th Cir. 1984); *Davis v. Rodman*, 147 Ark. 385, 227 S.W. 612 (1921) (physician has duty to exercise reasonable care to prevent the spread of infectious disease); *Hofman v. Blackmon*, 241 So. 2d 752 (Fla. Dist. App. 1970), *cert. denied* 245 So. 2d 257 (Fla. 1971); *Shepard v. Redford Community Hosp.*, 151 Mich. App. 242, 390 N.W.2d 239 (1986), *appeal denied* 431 Mich. 872 (1988); *Skillings v. Allen*, 143 Minn. 323, 173 N.W. 663, *aff'd* 143 Minn. 483, 173 N.W. 665 (1919); *Edwards v. Lamb*,

69 N.H. 599, 45 A. 480 (1899); *Wojcik v. Aluminum Co. of America*, 18 Misc. 2d 740, 183 N.Y.S.2d 351 (1959); *Jones v. Stanko*, 118 Ohio St. 147, 160 N.E. 456 (1928) (physical liability for injuries incurred by third person who contracted smallpox as result of physician's failure to warn).

When the existence of a special relationship is lacking between an actor and another, the actor may still be liable to third persons. Appellants rely upon the Restatement (Second) of Torts § 324A (1964) to support their argument that Hassan is responsible for actions or inactions which resulted in a reasonably foreseeable harm to a recognized class of third parties. Section 324A provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Kansas adopted § 324A in *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982). Syllabus ¶ 4 of that opinion reads as follows: "One who undertakes to render services to another which he should recognize as necessary for the protection of a third person is liable to the third person for harm resulting from his failure to exercise reasonable care. Restatement (Second) of Torts § 324A (1964)."

Kansas has accepted the § 324A theory of liability and established the following principles:

"[O]ne who does not assume an obligation to render services does not owe a duty to third persons." *Anderson v. Scheffler*, 248 Kan. 736, Syl. ¶ 3, 811 P.2d 1125 (1991).

"The threshold requirement for the application of the Restatement (Second) of Torts § 324A (1964) is a showing that the defendant undertook, gratuitously or for consideration, to render services to another. In order to meet this requirement, the evidence must show the defendant did more than act, but through affirmative action assumed an obligation or intended to render services for the benefit of another."

"A duty is owed to third persons by one who undertakes, by an affirmative act, to render aid or services to another and then is negligent in the performance of that undertaking." *McGee*, 248 Kan. 434, Syl. ¶¶ 5, 6.

"For a defendant to meet the threshold requirement of Restatement (Second) of Torts § 324A (1964), the defendant must not only take affirmative action to render services to another, but the person to whom the services are directed must accept such services in lieu of, or in addition to, such person's obligation to perform the services." *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, Syl. ¶ 3, 792 P.2d 993 (1990).

In *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 834, 877 P.2d 430 (1994), the court adopted a review of recent cases applying § 324A found in *Gooch*, 246 Kan. at 668:

"In each of the Kansas cases imposing liability under § 324A, it was clear that [the threshold] requirement was met. In *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), KCPL agreed to and was hired to render traffic engineering services to the City. In *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 672 P.2d 1083 (1983), the Kansas Turnpike Authority hired Howard-Needles as its consulting engineers to make safety inspections of the turnpike and thus render services to the KTA. In *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), there was evidence the county agreed with Kansas State Penitentiary officials and other law enforcement agencies to notify these agencies of escapes from the penitentiary. In *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), the police were obligated by a general police department order to take certain incapacitated persons into custody. Further, in the cases not finding a duty, it was clear there was no undertaking. In *Hanna v. Heur, Johns, Neel, Rivers & Webb*, 233 Kan. 206, [662 P.2d 243 (1983),] the court found the defendant architects did not agree to be responsible for safety practices on the jobsite and took no actions indicating they assumed any such responsibility. In *Meyers v. Grubaugh*, 242 Kan. 716, 750 P.2d 1031 (1988), the State simply allowed the intoxicated employee to leave work. Thus, in all cases where it was found that the parties undertook to render services to another, they agreed to or were obligated to perform services for another that were accepted and thus the initial requirement of § 324A was met; and, in all cases where liability was not imposed, the defendants had no agreement and took no affirmative action that could be construed as an intentional undertaking to render services to another."

In a negligence action based upon Restatement (Second) of Torts § 324A, the threshold requirement is that the defendant undertook to render services to another. Hassan conceded that in rendering medical treatment to Rylant, he undertook to render services for consideration to Rylant. However, Hassan contends

this fact alone does not trigger the application of § 324A because of the scope of his service to Rylant. "The extent of the undertaking should define the scope of the duty." *McGee*, 248 Kan. at 442. As a result, Hassan treated Rylant to help her stay awake during the day. He exercised reasonable care in prescribing medication to counter Rylant's drowsiness and, in turn, decreased the risk of harm to persons such as appellants. Last, Hassan argues that by simply treating Rylant, he did not undertake this service to be, in the words of § 324A, "necessary for the protection of third persons."

Hassan cites two cases supporting his position: *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, and *Anderson v. Scheffler*, 248 Kan. 736. In *Gooch*, the heirs at law and the administrator of the Pettis estate sued for negligent failure to warn after the Pettises were killed when a church collapsed on their residence. 246 Kan. at 664. Defendants Julius Kaaz, Kaaz Inc., GAB, Gerald Albright, and the City of Leavenworth moved for summary judgment. Kaaz, the president of Kaaz, Inc., had inspected the church and reported that a structural engineer would be needed to come up with a design for repair and replacement of the ceiling truss. An engineer who later inspected the church found it unsafe for human occupancy. 246 Kan. at 666. The city was notified and, following an inspection, the church was ordered to repair or remove the structure within 30 days.

Before the repairs were completed, the church collapsed on the residence next door, killing the Pettises. The trial court found the defendants had no duty to the plaintiffs under § 324A "because the defendants did not agree to be, or by their actions voluntarily assume to be, responsible for the safety of the structure." 246 Kan. at 669. The Kansas Supreme Court, in affirming the trial court's decision, stated: "Absent any duty to warn the Bethel Church, there could be no duty extending to Mr. and Mrs. Pettis. The fact that the Bethel Church may have had a duty to warn the Pettises does not create such a duty in these defendants absent an undertaking to render services to the Bethel Church and an acceptance of those services by the Bethel Church." 246 Kan. at 678.

In *Anderson*, the plaintiff was injured when he walked across an auger, following the delivery of poultry meal through another auger, and his foot slipped through the auger, amputating part of his leg. 248 Kan. 737. There was testimony that Scheffler undertook to provide engineering services when he designed and provided the component parts for the conveyor system. The plaintiff claimed that Scheffler failed to exercise reasonable care in designing the system and that he failed to warn Badger, the end user of the auger, of the danger of not having a grate over the auger.

The Kansas Supreme Court found the issue in *Anderson* to be whether "Scheffler undertook to render engineering or design services necessary to protect third persons." 248 Kan. at 741. In finding that Scheffler did not undertake to render such services, the court recognized: (1) Badger did not request a safety grate in its order; (2) Scheffler did not design the system, he only ordered component parts requested by Badger; and (3) there was no evidence Scheffler assumed the obligation of designing a safe conveyor system. 248 Kan. at 742.

Hassan argues that he, like Scheffler and the defendants in *Gooch*, never assumed the obligations that would be required before a duty could be imposed by law. Hassan contends he did not agree to protect third persons from Rylant's driving simply by virtue of treating her for her drowsiness. Rather, Hassan argues he only assumed the duty to exercise reasonable skill and care in her treatment.

Hassan also cites *Flynn v. Houston Emergicare, Inc.*, 869 S.W.2d 403 (Tex. App. 1993), as authority that he had no duty to appellants. In *Flynn*, the court found that under Texas law, a duty to protect the driving public existed only if the physician created the impairment that injured the victim. See 869 S.W.2d at 405-06. This is similar to the cases where courts have found liability for doctors who medicate patients in their offices and the patient is then involved in an accident after leaving the office. The court held that because there was no allegation or evidence that the defendant created the impairment that ultimately resulted in injury to the victim, that "defendants did not owe plaintiff a duty" to warn the patient not to drive. 869 S.W.2d at 406. Hassan argues that he did

not create the impairment that caused the injuries to the plaintiffs, therefore he owed appellants no duty.

Hassan argues that liability cannot lie under § 324A because even if he was negligent in failing to warn Rylant not to drive, this was not a situation where the negligence increased the risk of harm to the plaintiffs. Hassan submits that no treatment he provided caused Rylant's drowsiness. Hassan directs the court's attention to the fact that Rylant knew that if she was drowsy, she shouldn't drive, and if she was driving, she should pull over. The question was posed to Rylant in the following manner during depositions: "So then do I take it before the accident happened you were already aware of the fact that it was a possibility when you were driving to work or driving that you could doze off, get drowsy and doze off, didn't you, you knew that, did you not?" She responded, "Well, I would pull over, I mean common sense would say you would pull over."

Arguably, Rylant's knowledge or her common sense could absolve Hassan of liability. There is a general tort law principle that there is no duty to warn of the obvious, or of that which the plaintiff already knew or should have known. See *Roberts v. Bradley*, 114 Ga. App. 262, 150 S.E.2d 720 (1966) (slip and fall case where court held no liability because it was obvious, from the weather, the concrete was covered with ice); *Troxel v. A.I. DuPont Institute*, 431 Pa. Super. 464, 636 A.2d 1179 (1994) (defendant's conduct merely permitted the continuation of an existing risk; an inadequate basis upon which to impose liability under § 324A[a]). Consequently, Hassan argues Rylant's knowledge or common sense in this case demonstrates that the failure to warn did not increase the risk to appellants.

In *Joy v. Eastern Maine Medical Center*, 529 A.2d 1364, 1364-65 (Me. 1987), the Supreme Court of Maine allowed a third-party cause of action against a doctor and medical center whose treatment included fitting a patient with an eye patch and then negligently failing to warn the patient that he should not drive while wearing the eye patch. The patient was subsequently involved in an accident with Joy. The court cited various cases to support the general requirement that "when a doctor knows, or reasonably

should know that his patient's ability to drive has been affected, he has a duty to the driving public." 529 A.2d at 1366. The doctor in *Joy* made an argument similar to Hassan's, namely that the use of the eye patch created an obvious impairment for which no reasonable person required a warning. The court held such a factual determination was for the jury to decide. 529 A.2d at 1366.

Appellants contend there is a correlation between the facts of this case and instances where a physician furnishes a patient with medication which may cause drowsiness. Many courts require the physician to warn the patient not to drive or engage in other activities likely to cause injury. Similarly, then, appellants argue that if a physician knows or should know that a patient's medical condition may impair his or her ability to drive, the physician has an obligation to warn the patient. If a physician fails to warn a patient, and the patient's medical condition causes an accident, then the physician may be liable to injured third parties.

Hassan states this type of authority is distinguishable and has no significance in the present case because Rylant's drowsiness and subsequent falling asleep at the wheel were not caused by any medication prescribed by Hassan, but rather by a preexisting condition.

For instance, in *Wilschinsky v. Medina*, 108 N.M. 511, 775 P.2d 713 (1989), the court addressed the issue of whether a third party, who was injured by a person under the influence of medications administered to her as an outpatient in a doctor's office, could recover directly from the doctor if the doctor failed to follow proper medical procedures and the doctor's malpractice caused the injuries. The court found in the affirmative and noted the legal duty of physician to use reasonable care in treating patient extended to driving public when he administered drugs to patient with known side effects that may have caused drowsiness and impairment of judgment. 108 N.M. at 514-15. However, the *Wilschinshy* court was very quick to emphasize the narrowness of its decision:

"The duty is not to the entire public for any injuries suffered for which an argument of causation can be made. The duty specifically extends to persons injured by patients driving automobiles from a doctor's office when the patient has just

been injected with drugs known to affect judgment and driving ability." 108 N.M. at 515.

We recognize appellants' other cited authority. See *Watkins v. United States*, 589 F.2d 214 (5th Cir. 1979); *Welke v. Kuzilla*, 140 Mich. App. 658, 365 N.W.2d 205 (1985); *Zavalas v. Dept. of Corrections*, 124 Or. App. 166, 861 P.2d 1026 (1993), *rev. denied* 319 Or. 150 (1994); *Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521 (Tenn. 1980); *Gooden v. Tips*, 651 S.W.2d 364 (Tex. App. 1983); *Kaiser v. Suburban Transp. System*, 65 Wash. 2d 461, 398 P.2d 14 (1965).

After reviewing the Kansas case law and cases from other jurisdictions concerning the Restatement (Second) of Torts §§ 324A and 315 and the duty to third persons for the negligent acts of others, we conclude that Hassan may have had a duty to warn Rylant not to drive because of her sleeping disorder. We find persuasive *Duvall v. Goldin*, 139 Mich. App. 342, and similar cases and find that the doctor-patient relationship between Hassan and Rylant was a "special relationship" under § 315. Therefore, under Hassan's duty of reasonable care, there may have been a duty to warn Rylant not to drive. This is an issue of fact which must be resolved by the factfinder.

We also recognize that Hassan may also be liable for appellants' injuries under Restatement (Second) of Torts § 324A(a). He rendered services to Rylant and might be bound to recognize that those services were necessary for the protection of third persons, namely appellants. Hassan's failure to warn Rylant not to drive may have been a failure to exercise reasonable care. Whether Rylant had previous knowledge not to drive while drowsy and whether she would have heeded the warning or took it with a grain of salt are questions of fact for the trier of fact. Causation is a question for the trier of fact. See *Durflinger*, 234 Kan. at 488. Hassan's failure to warn may have increased the risk that Rylant would cause physical harm to herself and the driving public. Accordingly, Hassan might be subject to liability to the general public for failing to warn Rylant not to drive.

In recognizing that the extent of the undertaking (*i.e.*, Hassan's treatment of Rylant) should define the scope of the duty, it cannot

be said that the injuries sustained by appellants were unforeseeable. See *McGee,* 248 Kan. at 442. Hassan knew from his initial meeting with Rylant that she was having trouble staying awake when she drove. Hassan agreed to treat Rylant for her drowsiness and her trouble staying awake. It might have been a common-sense perception by Hassan as to the possibility of a traffic accident involving Rylant if she fell asleep while driving. This possible foreseeability may have imposed upon Hassan a duty of care since he may have known or reasonably should have known that a failure to warn Rylant would likely result in harm to herself and third parties. See *Cupples v. State,* 18 Kan. App. 2d 864, 879-80, 861 P.2d 1360 (1993).

We further note the court overstepped its bounds in concluding that Rylant would have fallen asleep while driving with or without Hassan's warning. Such a conclusion deals with a disputed issue of causation and is properly a question for the trier of fact. See *Durflinger,* 234 Kan. at 488.

In summary, based on the available evidence in the record, and mindful of the difficult standards for obtaining summary judgment, we find the court's grant of summary judgment to Hassan was in error. There are factual matters which must be resolved by the fact finder in this case. Based on the record at this time, a reasonable jury could find Hassan was negligent in the treatment of Rylant and was negligent in not telling her to refrain from driving due to the possibility of falling asleep at the wheel.

We further find that if the facts asserted by appellants are true, a cause of action would arise from the alleged negligence of the treating physician in favor of persons injured by Rylant.

Reversed and remanded.