A01A0953. SHORTNACY et al. v. NORTH ATLANTA INTERNAL MEDICINE, P.C. et al.
(556 SE2d 209)

ANDREWS, Presiding Judge.

The Shortnacy family[1] and Kirk Zoeller, plaintiffs below, appeal from the trial court's order finding a proper case and granting the motion of defendants North Atlanta Internal Medicine, P.C., Jamie Pappas, M.D., and Alice Doe[2] to open default pursuant to OCGA § 9-11-55 (b) and the subsequent order granting defendants summary judgment on the claims of the Shortnacy family.

This suit stems from an automobile accident on December 18, 1992, in which plaintiff Zoeller, driving the wrong way on Georgia 400, collided head-on with the car carrying the Shortnacy family, causing injuries to all.

> The standards applicable to motions for summary judgment are announced in *Lau's Corp. v. Haskins,* 261 Ga. 491 (405 SE2d 474) (1991). When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.,* 187 Ga. App. 594, 596 (370 SE2d 843) (1988). Further, this court conducts a de novo review of the

---

[1] Husband and wife David and Valerie and their two minor sons, Austin and Thomas.
[2] Later identified as Alice Williams, an office clerk doing billing and insurance claims for North Atlanta.

law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

*Clark v. Cauthen*, 239 Ga. App. 226, 227 (1) (520 SE2d 477) (1999).

So viewing the evidence, it was that Zoeller had previously suffered an injury resulting in a herniated disk and lower back pain. He was referred to Dr. Pappas and first seen by him in the hospital on November 16, 1992. Zoeller was hospitalized for six days and received Demerol (pain medication), Phenergan (anti-nausea medication), muscle relaxers, and other medications while hospitalized. Thereafter, Zoeller was seen by Dr. Pappas at his office.

During his office treatments, Zoeller received physical therapy as well as the administration of medications, including Demerol and Phenergan. Prior to December 18, 1992, Zoeller had been treated at Dr. Pappas' office approximately six times. During two of these visits, Zoeller was administered Demerol and Phenergan. On December 18, 1992, Zoeller was asked by the nurse, prior to receiving the Demerol and Phenergan, if he had had any problems driving himself home previously, and he said he had not. The injection record states that Zoeller was told that he should not drink alcohol, drive, or operate heavy or light machinery for 12 hours after the injections. The injections were given between 11:30 a.m. and noon.[3] Zoeller left Dr. Pappas' office between noon and 12:30 p.m. He drove onto Shallowford Road, proceeded on Interstate 285 to Georgia 400 and headed north. Zoeller recalls nothing else until his collision with the Shortnacy vehicle at 6:45 p.m., and his whereabouts and activities are otherwise unaccounted for. Zoeller's blood and urine samples, taken after the accident, were positive for marijuana.

The complaint was filed on December 16, 1994, asserting a breach of "general common law tort duty of ordinary care," as well as a count for alleged "medical and nursing negligence." The returns of service indicate all defendants were served on December 19, 1994. Dr. Pappas called MAG Mutual, his insurer, reported the suit, and then forwarded the pleadings to MAG Mutual by United States Postal Service Express Mail. They were received on Friday, December 30, 1994. Because of the New Year holiday, MAG Mutual was staffed that day by a skeleton crew of four, including Ms. Nix. As was the company practice, incoming mail was picked up at the post office box and delivered to the office by Dependable Courier Service, where Nix sorted it and placed it in bins in the mailroom for distribution on January 3, 1995, when the office reopened. Nix also removed the Christ-

---

[3] This evidence is disputed, with the medical chart indicating the shots were given between 9:30 a.m. and 9:50 a.m. For purposes of the motion for summary judgment, however, the evidence is viewed in plaintiffs' favor.

mas tree decorations and placed them in storage bins which were also placed in the mailroom for storage. Somehow, the pleadings received from Dr. Pappas were inadvertently stored with the Christmas decorations and were not discovered until December 1, 1995, when the decorations were unpacked.

About two months after forwarding the documents to MAG Mutual in December 1994, Dr. Pappas called about another matter and inquired about the Zoeller case. He was told not to worry and that MAG Mutual was taking care of it. He also called in July 1995 and inquired about the case, but could not recall specifically what he was told.

In the interim, the affidavits of service were filed in the trial court on January 5, 1995, and on November 16, 1995, the Shortnacys and Zoeller filed their motion for default judgment on liability. The default judgment was entered by the court on November 17, 1995. On December 11, 1995, after discovery of the pleadings by MAG Mutual on December 1, 1995, defendants' motion to open default was filed.

1. The Shortnacys and Zoeller first enumerate as error the trial court's opening of the default.

OCGA § 9-11-55 (b) allows the court to open a default before final judgment in certain circumstances.

> "(A) default may be opened if the [defendants] satisfied the four conditions and one of the three grounds for opening a default. The four conditions are: (1) showing made under oath, (2) offer to plead instanter, (3) announcement of ready to proceed to trial, and (4) setting up a meritorious defense. The three grounds are: (1) providential cause, (2) excusable neglect, and (3) a proper case. (Cit.) Whether to open the default on one of the three grounds rests within the discretion of the trial judge. (Cit.)" *Bryant v. Haynie*, 216 Ga. App. 430, 431 (1) (454 SE2d 533) (1995). If the four conditions are not met, the court cannot exercise its discretion to open the default. *C. W. Matthews Contracting Co. v. Walker*, 197 Ga. App. 345, 346 (1) (398 SE2d 297) (1990).

*Ford v. St. Francis Hosp.*, 227 Ga. App. 823, 824-825 (1) (490 SE2d 415) (1997).

Where, as here, the order opening default does not specify the ground upon which the motion was granted, we will presume that it was premised upon the "proper case" ground, which is the broadest of the three available grounds. *Ford*, supra at 826. Our sole function on review of the grant of a motion to open default is to determine, once the four conditions are met, whether the trial court abused its discretion based on the particular facts of the case before it. *Majestic*

*Homes v. Sierra Dev. Corp.*, 211 Ga. App. 223, 224 (1) (438 SE2d 686) (1993).

Plaintiffs do not argue that defendants failed in meeting any of the requisite four conditions. They contend that the trial court abused its discretion in opening default because of defendants' "direct neglect" in failing to follow up on the litigation and because of defendants' "imputed neglect" based on the insurer's misplacement of the documents.

The "direct neglect" argument is premised on the alleged sophistication of Dr. Pappas and his professional corporation based on their claimed familiarity with litigation of other matters over a period of years. Even assuming without deciding that such legal sophistication has been shown, no authority for the argument that this sophistication would impose a greater burden on such a party is presented, and the cases we have reviewed have provided none.

Rather, " '[t]he rule permitting opening of default is remedial in nature and should be liberally applied, for default judgment is a drastic sanction that should be invoked only in extreme situations. Whenever possible cases should be decided on their merits for default judgment is not favored in law.' (Citations and punctuation omitted.) [*Miller v. Tranakos*, 198 Ga. App. 668, 669 (1) (402 SE2d 772) (1991).]" *Sagnibene v. Budget Rent-A-Car Systems*, 209 Ga. App. 44, 46 (3) (432 SE2d 639) (1993).

Regarding the "indirect negligence," Dr. Pappas forwarded the matter to his insurer and was depending on that insurer to provide a defense, to which he, his professional corporation, and his employee were entitled under the policy. Later, Dr. Pappas was assured, at least once, that the matter was being attended to. We find no abuse of discretion in the trial court's opening the default because the defendants had reason to believe that the suit was being defended by their insurance company. See, e.g., *Pinehurst Baptist Church v. Murray*, 215 Ga. App. 259, 262 (2) (450 SE2d 307) (1994); *Sagnibene*, supra; *Mars, Inc. v. Moore*, 207 Ga. App. 912, 913 (429 SE2d 299) (1993); *Powell v. Eskins*, 193 Ga. App. 144 (387 SE2d 389) (1989); *Sears, Roebuck & Co. v. Ramey*, 170 Ga. App. 873 (318 SE2d 740) (1984); *Cobb County Fair Assn. v. Boyle*, 143 Ga. App. 754 (240 SE2d 136) (1977).

Further, plaintiffs have demonstrated no prejudice to their case by the opening of default, particularly since they waited 11 months after filing proof of service to move for entry of default judgment. Also, the potential for manifest injustice exists in this case if default judgment is entered against the defaulting defendants because they have pled what appears to be a meritorious defense, as discussed in Division 2. *McCombs v. Synthes (U.S.A.)*, 250 Ga. App. 543, 547 (2) (553 SE2d 17) (2001).

2. The Shortnacy plaintiffs appeal from the trial court's grant of summary judgment to defendants which held that defendants owed no duty of care to them as a matter of law.

It is undisputed that no member of the Shortnacy family had a doctor-patient relationship with Dr. Pappas or North Atlanta Internal Medicine and Dr. Pappas had no personal knowledge of them.[4]

Because the Shortnacy plaintiffs urge this Court to find either that the "general common law tort duty of ordinary care" would extend to this situation, or to analogize the duty created by the Dram Shop Act to this situation, thereby creating a duty of the doctor to the general public, it is a matter of first impression in this State.

The trial court's order thoroughly and correctly addresses these contentions, and we hereby adopt and set it out, in pertinent part and as supplemented, as our own.

To state a cause of action for negligence in Georgia, a plaintiff must show (1) a legal duty to conform to a standard of conduct raised by law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) loss or damage to plaintiffs' legally protected interest resulting from the breach. *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982). The mere occurrence of an unfortunate event is not sufficient to authorize an inference of negligence. *Amos v. City of Butler*, 242 Ga. App. 505, 506 (1) (529 SE2d 420) (2000); *Walker v. MARTA*, 226 Ga. App. 793, 798 (1) (487 SE2d 498) (1997). A plaintiff must come forward with specific facts establishing a breach of duty, as well as the other elements of negligence, and may not rest upon generalized allegations. *Bradley Center*, supra; *Tuggle v. Helms*, 231 Ga. App. 899, 902 (2) (499 SE2d 365) (1998).

Generally, there is no duty to control the conduct of third persons to prevent them from causing physical harm to others. *Bradley Center*, supra; *Landis v. Rockdale County*, 212 Ga. App. 700, 703 (445 SE2d 264) (1994) (both set out the general rule of Restatement (Second) of Torts, § 315). There are two exceptions to this general rule where: "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." (Punctuation omitted.) Id.

---

[4] There could be no duty, therefore, premised upon the relationship of doctor and patient as far as the Shortnacy family is concerned. See *Purcell v. Breese*, 250 Ga. App. 472, 475-476 (2), (3) (552 SE2d 865) (2001).

(a) *Bradley Center*, supra, is an example of a situation establishing the former exception in which a legal duty is found in that

> "where the course of treatment of a mental patient involves an exercise of 'control' over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient." [Cit.]

Id. at 201.

This emphasis on control over the patient as the touchstone for imposing this duty to third parties for the criminal acts of the patient has been repeatedly stated. *Ward v. Emanuel County Bd. of Health*, 218 Ga. App. 382, 383 (461 SE2d 559) (1995) (psychotic and schizophrenic outpatient not under control of physician when he killed his parents and brother); *Keppler v. Brunson*, 205 Ga. App. 32 (421 SE2d 306) (1992) (no duty on general practitioner and drug and alcohol treatment facility and its treating physician to third parties when voluntary patient killed his sister, her husband, and himself); *Ermutlu v. McCorkle*, 203 Ga. App. 335, 337 (1) (416 SE2d 792) (1992) (no duty to third parties on treating psychiatrist of manic depressive outpatient who did not qualify for involuntary commitment pursuant to OCGA § 37-3-163); *Baldwin v. Hosp. Auth. of Fulton County*, 191 Ga. App. 787, 789 (2) (383 SE2d 154) (1989) (no duty because no ability to control, i.e., no legal authority to confine or restrain patient against his will).

Therefore, the trial court correctly concluded that there was no duty to the Shortnacy family based on this exception to the general rule.

(b) The Shortnacy family also argues a duty under the second exception, a "special relation exists between the actor (Dr. Pappas) and the other which gives to the other a right to protection."

To the extent this argument is premised upon the "special relationship" recognized in *City of Rome v. Jordan*, 263 Ga. 26 (426 SE2d 861) (1993), it is unavailing. In that case and its progeny, the "special relationship" applies only to liability of a governmental entity for the acts or omissions of the police or similar governmental public safety agency in its duties to the public. *Huntington v. City of Atlanta*, 241 Ga. App. 301 (527 SE2d 6) (1999); see *Rowe v. Coffey*, 270 Ga. 715, 716 (515 SE2d 375) (1999).

We decline, as did the trial court, to expand that duty to this situation. See *Vance v. T. R. C.*, 229 Ga. App. 608, 610 (1) (a) (494 SE2d 714) (1997) (physician's statutory duty to report child abuse to proper

authorities does not create a civil cause of action and is not analogous to the public duty doctrine).

(c) We also decline to find that the duty of a health care provider to the public at large is similar to the duty imposed on providers of alcohol pursuant to OCGA §§ 51-1-40 and 3-3-22.

First, the duty encompassed by these two statutes on providers of alcohol was imposed by the legislature, and any expansion of this duty as urged by the Shortnacy family is also within the purview of the legislature and not the courts. *Etkind v. Suarez*, 271 Ga. 352 (1) (519 SE2d 210) (1999).

Second, it has recently been stated that while OCGA § 51-1-40 (b) "sets forth a basis for civil liability where an alcohol provider knowingly continues to serve alcohol to an intoxicated person[,] . . . *nothing in that statute or any other provision of Georgia law mandates that a provider of alcoholic beverages must prevent an intoxicated person from driving.*" (Emphasis supplied.) *Armstrong v. State*, 244 Ga. App. 871, 873 (2) (537 SE2d 147) (2000).

Third, to expand such a duty of health care providers to the public at large would be inconsistent with the physician-patient relationship and, therefore, contrary to public policy. Several other jurisdictions have considered this issue, and we find their rationales in finding such a duty contrary to public policy persuasive. As stated in *Webb v. Jarvis*, 575 NE2d 992, 997 (I) (C) (Ind. 1991):

A physician's first loyalty must be to his patient. Imposing a duty on a physician to predict a patient's behavioral reaction to medication and to identify possible plaintiffs would cause a divided loyalty. Were we to impose a duty on a physician to consider the risk of harm to third persons before prescribing medication to a patient, we would be forcing the physician to weigh the welfare of unknown persons against the welfare of his patient. Such an imposition is unacceptable. The physician has the duty to his patient to decide when and what medication to prescribe to the patient, and to inform the patient regarding the risks and benefits of a particular drug therapy. He should fulfill that duty without fear of being exposed to liability to unknown, unidentified third persons.

See also, e.g., *Estate of Witthoeft v. Kiskaddon*, 557 Pa. 340 (733 A2d 623) (1999); *Praesel v. Johnson*, 41 Tex. Sup. J. 630 (967 SW2d 391) (1998); *Calwell v. Hassan*, 260 Kan. 769 (925 P2d 422) (1996).

The foreign cases relied upon by appellants are inaccurately characterized. One has been expressly overruled, stating that "such a rule would subject physicians to liability claims from unknown third parties for the acts of patients over which physicians would have no

control." *Calwell*, supra at 787, overruling *Calwell v. Hassan*, 21 Kan. App.2d 729 (908 P2d 184) (1995). The other, *Gooden v. Tips*, 651 SW2d 364 (Tex. App. 1983), has been subsequently distinguished and limited to its facts. See, e.g., *Bird v. W. C. W.*, 37 Tex. Sup. J. 329 (868 SW2d 767) (1994).

Therefore, defendants were correctly granted summary judgment.

*Judgment affirmed. Eldridge and Miller, JJ., concur.*

DECIDED NOVEMBER 6, 2001 — 

*Clinton W. Sitton, Robert H. Benfield, Jr.*, for appellants.
*Love, Willingham, Peters, Gilleland & Monyak, Jonathan C. Peters, Vicki M. Miller, Michael T. Carithers*, for appellees.