Nos. 72,817
73,062

KENNETH C. CALWELL, *Appellant*, v. RIZWAN U. HASSAN, M.D., *et al., Appellees.*

JOSEPH W. (TREY) HALL, *Appellant*, v. RIZWAN U. HASSAN, M.D., *Appellee.*

(925 P.2d 422)

Opinion filed October 25, 1996.

*Nicholas S. Dailey*, of Depew and Gillen, L.L.C., of Wichita, argued the cause and was on the briefs for appellants Calwell and Hall.

*Lee H. Woodard*, of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, argued the cause, and *James Z. Hernandez* and *Rachelle W. Smith*, of the same firm, were with him on the briefs for appellee Hassan.

*Wayne T. Stratton* and *Anne M. Kindling*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* Kansas Medical Society.

The opinion of the court was delivered by

Six, J.: The first impression issue is whether the physician in this case owes a duty to the bicycling plaintiffs (or other members of the driving public) under either Restatement (Second) of Torts § 315 (1964) or § 324A (1964), arising from his failure to warn the patient not to drive. Kenneth C. Calwell and Joseph W. (Trey) Hall were injured in a head-on collision with a car driven by defendant Sharon K. Rylant. Rylant fell asleep while driving on August 8, 1991, and veered across the road. Defendant Rizwan U. Hassan, M.D., a neurologist, was treating Rylant for a sleep disorder. Calwell and Hall alleged that Hassan negligently treated Rylant for her sleep disorder and failed to warn her not to drive. The district court granted Hassan's motion for summary judgment, deciding as a matter of law that he owed no duty to Calwell and Hall. In the alternative, the district court reasoned that even if a duty was owed, no causal connection existed between Hassan's failure to meet that duty and the plaintiffs' injuries. Calwell and Hall appealed. The Court of Appeals reversed. *Calwell v. Hassan*, 21 Kan. App. 2d 729, 908 P.2d 184 (1995). Our jurisdiction results from granting Hassan's petition for review. K.S.A. 20-3018(b).

We find no duty owing, reverse the Court of Appeals, and affirm the trial court. (Two personal injury suits are consolidated in this appeal. Both Calwell and Hall sued Hassan. Calwell also sued Rylant. The Court of Appeals granted Calwell's application for permission to take an interlocutory appeal.)

## FACTS

Hassan first saw Rylant, who was 45 years old, on June 21, 1988, for her problem of daytime drowsiness. Hassan's notes from the

initial visit reflect: "According to [Rylant], she sleeps on her breaks at work and also while driving she has to fight to stay awake and also she feels foggy most of the time." Hassan's impression was: "Disorder of excessive sleep (D.O.E.S.). Rule out narcolepsy." Rylant was scheduled for a "multiple sleep latencies test" (MSLT), which involves allowing the patient to fall asleep in a laboratory setting. The time it takes the patient to fall asleep is measured and compared. Rylant also underwent a polysomnogram, which involves an overnight sleep monitored in a laboratory setting.

Hassan observed Rylant had no breathing problems in her sleep, which showed she did not have sleep apnea. Hassan's impression was that the MSLT results were consistent with the disorder of "excessive daytime sleep." He ruled out the possibility that Rylant had narcolepsy, based on her history and the lack of associated symptoms. Hassan described narcolepsy as "an irresistible sleep and patient will fall asleep without warning" and "has more than usual REM sleep." Rylant had no history suggesting cataplexy, which is a symptom that often accompanies narcolepsy.

Because the accident injuring Calwell and Hall occurred more than 3 years after Rylant's initial appointment, we will describe her treatment schedule with Hassan.

On July 27, 1988, Hassan explained the test results to Rylant and prescribed 25 mg. of Elavil at bedtime for 4 days, thereafter increasing to 50 mg. at bedtime. Hassan next saw Rylant on August 8, 1988. Rylant was pleased with the Elavil and did not have to fight sleep any more during the daytime. "Rylant stated that after she started taking Elavil and also after the dosage was increased, she had no problem staying alert when driving." 21 Kan. App. 2d at 730-31. Hassan continued the Elavil at 50 mg. per day at bedtime and scheduled Rylant for an appointment in 3 months. On August 17, 1988, Rylant saw Hassan for a complaint of hives. He gave her Benadryl, along with the Elavil. On November 11, 1988, Rylant complained to Hassan that the Elavil was not working as well and she had a recurring problem of sleeping in the daytime. He increased the Elavil to 75 mg. per day at bedtime and scheduled a follow-up appointment in 1 month. Rylant saw Hassan again on December 21, 1988, and she was doing fine. A follow-up visit was

scheduled in 3 months. However, Rylant did not keep her appointment and did not see Hassan again until June 1, 1989, when she complained of problems with sleepiness. Hassan increased the Elavil to 100 mg. per day at bedtime and scheduled a follow-up visit in 3 months. Rylant again did not keep her appointment. She next saw Hassan on July 31, 1990. His notes reflected that she complained of not having sound sleep during the night, more dreaming, and she could sleep during daytime anytime. She also seemed more depressed. Hassan started Rylant on 20 mg. per day of Prozac in the morning on a trial basis (along with the Elavil at bedtime) and scheduled Rylant to come back in 20 days. Rylant reported "doing better" at her August 22, 1990, follow-up visit. The medication was continued, and she was scheduled for another appointment in 4 months, which she did not keep. Hassan did not see Rylant again until July 29, 1991, when she complained of dozing off at work and going into a dreaming state. She also took occasional naps at break during work. Hassan discussed with Rylant her sleep hygiene, i.e., sleep schedule, habits, and diet. He scheduled her for a follow-up visit in 4 months.

Before the August 8, 1991, accident Rylant had never fallen asleep driving. She had not reported to Hassan, other than in the initial June 1988 appointment, any problems related to her driving. "Hassan testified that Rylant never told him at any of her appointments that she had ever fallen asleep while driving, as she had done at work, nor that she could not stay awake while driving. For these reasons, Hassan stated he did not feel it was necessary to warn her not to drive." 21 Kan. App. 2d at 731. Hassan understood her initial complaint to mean that she could stop driving if she felt drowsy. Rylant did not ask Hassan whether she should drive. Rylant's husband said that if Hassan had told Rylant not to drive, he would have been available to drive her to work.

Initially, when Rylant took the prescribed medication, she always was alert. When Rylant did not return for her scheduled appointments, it was because the medication was working. She was not having trouble with sleepiness or drowsiness during the day. She did not go to the doctor unless something was wrong.

On August 8, 1991, Rylant arose as usual at 4:30 a.m., fixed her husband breakfast, and left the house to drive to work. She customarily left at 5:45 a.m. Her work shift began at 7:30 a.m. She stopped at the stop sign and crossed an intersection which was torn up and required some maneuvering. Between crossing that intersection and coming to the next intersection, she began to feel drowsy. The next thing she knew, she heard someone say, "Oh my God," felt an impact, and stopped her car on the left side of the road; she had struck and seriously injured bicycle riders Calwell and Hall.

On the day of the accident, Rylant knew that she had a problem with drowsiness and that it was getting worse. She had never before just fallen asleep like she did that morning. However, she knew she could fall asleep if she was drowsy and that she should not drive if she was too drowsy. She knew from common sense that if she got drowsy, she would pull off to the side of the road, but she did not recall ever having pulled over on the way to work.

Rylant phoned Hassan after the accident that day and came to see him. She reported that her problems with drowsiness commenced 2 days before the accident. Also, she had been having dizziness and vertigo during the week before the accident and had gone to see another doctor for a virus affecting her inner ears. Hassan told her not to drive until her dizziness and vertigo improved and asked her to call him in a week to schedule a new polysomnogram and MSLT. Rylant did not return to Hassan. She stopped taking her medicine and did not see anyone else for the drowsiness problem. She has driven herself to work since the accident.

## The Summary Judgment Motion

Hassan asserted in his motion for summary judgment that as a matter of law, he did not owe a duty to either Calwell or Hall (attached to the motion were portions of depositions—his own, Rylant's, and Calwell's—and part of Rylant's medical records.). Calwell and Hall responded, controverting some of Hassan's factual allegations and submitting portions of depositions of Hassan; Rylant; Rylant's husband; Dr. Harry White, Clinical Professor of

Neurology at the University of Missouri, Columbia, Missouri, plaintiff's medical expert; Dr. Dorsey Dysart, Hassan's medical expert; and excerpts from various medical texts concerning sleep disorders.

Calwell and Hall submitted excerpts of pages from the Physician's Desk Reference (PDR) describing the drugs Elavil and Prozac. Elavil is described as an amitriptyline and an antidepressant with sedative effects. Prozac is described as an antidepressant suggested for depression.

White reviewed the medical records. He was not certain whether Rylant had narcolepsy. His best guess was that she had idiopathic CNS hypersomnolence, which is one type of excessive daytime sleep disorder, and could also be narcolepsy. White described narcolepsy as a disorder of excessive sleep characterized principally by periodic attacks of an irresistible urge to fall asleep. When asked the question "This patient, Mrs. Rylant, did not have narcolepsy, did she?" White responded, "I'm not certain what she had." When asked whether there was a difference between narcolepsy and idiopathic hypersomnolence, White stated, "I don't think that's a resolved issue yet." White's report does not state that Hassan's treatment was inappropriate. White did not offer any comment on whether the medication Rylant was taking contributed to her drowsiness on the date of the accident. When asked what medications Rylant was taking on the date of the accident, White stated, "I have no idea what medicine she was on that morning." In a letter to counsel for Calwell and Hall, White gave the following opinions:

"(1) Was Dr. Hassan's diagnosis of excessive daytime sleeping disorder correct?

"Yes. Her history clearly indicated a pathological state beyond simple tiredness, fatigue, or exhaustion. Mrs. Rylant, by the history recorded, has what is diagnostically referred to as a Disorder Of Excessive Somnolence. I suspect that a more specific diagnosis would be idiopathic hypersomnolence. This description refers to repeated and persistent drowsiness without known cause and the absence of REM-onset sleep and cataplexy.

"(2) Was the treatment appropriate?

"In part, yes. Sleep hygiene instructions as given are appropriate. The medication prescribed, amitriptyline [Elavil], is appropriate for the symptoms of cat-

aplexy . . . which she did not have. Medications used to prevent excessive somnolence are Ritalin, Dexedrine, and Cylert.

"(3) Should Dr. Hassan advise her not to drive?

"In my opinion, he should have advised her not to drive until her symptoms of excessive daytime somnolence became controlled with medication or otherwise ceased."

Dysart's impression based on a review of Rylant's medical records and not on a personal examination, was that Rylant had a "hypersomnolence secondary to mood disorder." He disagreed with White's diagnosis of idiopathic hypersomnolence. Dysart described hypersomnolence as "[e]xcessive daytime sleepiness, more than usual, causing difficulty in the daytime, making it difficult to stay awake." Dysart believed that a person with Rylant's MSLT results could have an irresistible urge to go to sleep during the day. He did not say that Rylant's history showed she had such irresistible urges. When asked whether Dysart believed that driving should have been discussed with Rylant, he stated:

"Depends on the degree. There are, basically, they talk about three levels of hypersomnolence with the International Classification of Sleep Disorders from mild to severe. *She says she never had trouble staying awake driving* and only napped occasionally, never got in trouble when she was working for being found asleep on the job. *There was a history that the husband never noted that she had difficulty staying awake when driving.* I think it would have been left up to the conversation, but with that I would say I have no reason to say, based on that, not to drive unless there is apparent urges to fall asleep that she couldn't resist. For example, in the case of narcolepsy, was napping at work, and I don't know how stimulating it was." (Emphasis added.)

Dysart did not think it was inappropriate to use Elavil. However, Dysart would not use Prozac, that is, it would not be his first drug of choice, because it can cause insomnia in some and a sedation response in others. Dysart was under the mistaken impression that Hassan had prescribed Prozac to be taken at night, instead of the morning.

The district judge decided, as a matter of law, that Hassan owed no duty to Calwell and Hall and also stated an alternate reason for his decision:

"Even if the duty plaintiff claims exists, there is, as a matter of law, no causal connection between the failure to meet that duty by Hassan and the accident.

Nothing would have been accomplished for Hassan to have advised Rylant not to drive. . . . His advising her of what she already knew would be redundancy accomplishing nothing and is certainly too scant a connection to liable him for her negligent actions."

The district judge noted that he could not "discern medical testimony and evidence that Dr. Hassan deviated from standard medical care in the administration of either Elavil or Prozac" and none of what was presented "create[d] a factual dispute dealing with either medically inappropriate medication of Rylant or failure to advise her of the effects of medication causing drowsiness or sleeping while driving."

The Court of Appeals reversed and remanded, determining that under Restatement (Second) of Torts § 315, the doctor-patient relationship between Hassan and Rylant was a "special relationship" and "there may have been a duty to warn Rylant not to drive." 21 Kan. App. 2d at 748. The Court of Appeals also recognized that Hassan may be liable under Restatement (Second) of Torts § 324A, in that his failure to warn Rylant not to drive "may have increased the risk that Rylant would cause physical harm to herself and the driving public." 21 Kan. App. 2d at 748. The Court of Appeals did not decide as a matter of law that Hassan had a duty to advise Rylant not to drive, but rather said only that Hassan "may" have had such a duty. The legal question of whether a duty exists was left to the trier of fact. The Court of Appeals also noted a "disputed issue of causation." 21 Kan. App. 2d at 749. The Court of Appeals labeled this case a "personal injury/medical malpractice case." 21 Kan. App. 2d at 729. Personal injury negligence and medical malpractice cases require similar proof, except the element of injury and causation in medical malpractice cases is usually phrased in terms of a causal connection between the breached duty and the injury "sustained by the patient." See *Wozniak v. Lipoff*, 242 Kan. 583, 587, 750 P.2d 971 (1988). Although key players in this case include a physician and a patient, there is no allegation here of injury "sustained by the patient." Thus, while this is a negligence case based in part on the actions of a physician toward his patient, we disagree with the medical malpractice characterization. See *Boulanger v. Pol*, 258 Kan. 289, 297-98, 900 P.2d 823 (1995).

## DISCUSSION

This case is before us on summary judgment. The standard of review applicable to summary judgment motions instructs us to ask: (1) Do the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact; (2) could reasonable minds differ as to the conclusions drawn from the facts; (3) have we read the record in the light most favorable to the party defending against the motion; and (4) has the nonmoving party come forward with specific facts showing a genuine issue for trial? *Moorhouse v. City of Wichita*, 259 Kan. 570, 575-76, 913 P.2d 172 (1996). From our review of the record, we conclude no disputed material facts prevent our consideration of whether a duty is owing from Hassan to Calwell and Hall.

### Is There A Duty Owing?

Calwell and Hall contend that Hassan had a duty to warn Rylant not to drive because her driving was a foreseeable risk to the driving public. They reason that if a doctor knows or should have known that a patient's condition might impair the ability to drive, the patient should be warned. According to Calwell and Hall, Hassan "breached his duty owed to Rylant, and given the foreseeable dangerous nature of her condition," (21 Kan. App. 2d at 735) he also breached a duty to the general public.

A review of the elements of a negligence claim is appropriate. For negligence to exist there must be a duty owed by one person to another and a breach of that duty. The injured party must show: (1) a causal connection between the duty breached and the injury received and (2) damage from negligence. An accident which is not reasonably foreseeable by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. A fundamental rule is that actionable negligence must be based on a breach of duty. *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983). A special relationship between certain persons could cause a duty. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact. Whether there is

a causal connection between the breached duty and the injuries sustained is also a question of fact. 234 Kan. at 488.

Our review of questions of law is unlimited. *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 831, 877 P.2d 430 (1994). Without a duty there can be no breach to support the claims of Calwell and Hall. See *Nero v. Kansas State University*, 253 Kan. 567, 571, 861 P.2d 768 (1993).

The Court of Appeals applied the Restatement (Second) of Torts § 315 and § 324A and found a duty owing. Thus, we turn to an examination of those two sections of the Restatement as applied in our cases. We begin with the observation that historically there is no general duty to act for the protection of others.

We said in *C.J.W. v. State*, 253 Kan. 1, Syl. ¶ 2, 853 P.2d 4 (1993):

"As a general rule, in the absence of a 'special relationship' there is no duty on a person to control the conduct of a third person to prevent harm to others. A special relationship may exist between parent and child, master and servant, the possessor of land and licensees, persons in charge of one with dangerous propensities, and persons with custody of another."

The Court of Appeals found a § 315 "special relationship," observing "there may have been a duty to warn Rylant not to drive." 21 Kan. App. 2d at 748.

The Restatement (Second) of Torts § 315 (1964), provides:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Comment (c) to § 315 in part explains:

"The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. [§ 316, Duty of Parent to Control Conduct of Child; § 317, Duty of Master to Control Conduct of Servant; § 318, Duty of Possessor of Land or Chattels to Control Conduct of Licensee; § 319, Duty of Those in Charge of Person Having Dangerous Propensities] The relations between the actor and the other which require the actor to control the conduct of the third persons for the protection of the other are stated in §§ 314A and 320."

We recently considered the existence of a physician-patient special relationship involving a duty to warn claim under § 315 in *Boulanger*, 258 Kan. 289. Our holding in *Boulanger* is significant in the resolution of this case. See *Boulanger*, 258 Kan. at 304 for a list of our § 315 special relationship cases.

Boulanger was shot by Hill, a patient of Dr. Pol's, 10 days after Hill's release from Applewood Care Center, Inc. (Applewood), an intermediate health care facility which Hill had voluntarily entered. Although before entering Applewood, Hill had a history of violence against Boulanger, his uncle, Hill did not indicate any intention to harm Boulanger while at Applewood. Boulanger sued Pol, Applewood's medical director, and Applewood for negligent release. Pol was Hill's primary care physician during Hill's stay at Applewood. The district court granted summary judgment for defendants. One of the issues was whether Pol and Applewood owed a duty to Boulanger based on the special relationship doctrine in § 315 of the Restatement. Boulanger argued that Pol had a duty either to detain Hill and seek his involuntary commitment or to warn Boulanger of the danger. We held that no § 315 special relationship existed. Boulanger was fully aware of his nephew's propensity for violence at the time of Hill's release. Pol and Applewood had neither a duty to warn Boulanger, nor a duty to take affirmative action to control Hill even if a special relationship under § 315 had been established. 258 Kan. at 308. We further determined that neither Pol nor Applewood had the requisite control of Hill which might create a duty under § 319 (duty of those in charge of a person having dangerous propensities). 258 Kan. at 308. Thus, no special relationship existed imposing any duty under § 315.

None of the Kansas cases in which a "special relationship" has been found concern medical doctor/outpatient relationships. We are aware that *Mahomes-Vinson v. U.S.*, 751 F. Supp. 913 (D. Kan. 1990), did find a § 315 special relationship between a psychotherapist and a voluntary mental patient in a negligent release case arising from the rape, sodomy, and murder of two young girls. The *Mahomes-Vinson* court noted that the records indicated the mental patient had 90 incidents involving sexual deviance or violent behavior since beginning treatment at the Veterans Administration

(VA). The patient's wife stated he had fantasies about little girls 2 weeks before the murders. The patient told the supervising physician prior to release that "I need to stay away from little girls." 751 F. Supp. at 916. A psychiatrist opined that the patient should have been involuntarily committed at the time of his release and that the two murdered children were identifiable as potential targets at the time of discharge. *Mahomes-Vinson* focused on the VA's duty to detain its mental patient, possibly even to the extent of seeking involuntary commitment. *Mahomes-Vinson* is distinguished from this case.

Only in *C.J.W.*, 235 Kan. 1; *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984); and *Washington v. State*, 17 Kan. App. 2d 518, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992), (all involving juvenile or adult incarceration settings) was there a finding of a special relationship creating any duty under § 315. In *Boulanger*, we decided that a psychiatrist owed no affirmative duty to the injured plaintiff with respect to a voluntary mental patient. 258 Kan. 289. In *Nero*, 253 Kan. 567, we found that a material issue of fact remained about whether Kansas State University (KSU) owed Nero a duty under a landlord-tenant theory, not under § 315. Nero, a female student, was sexually assaulted in a KSU residence hall by Davenport, a male co-resident. She sued KSU for negligence, alleging KSU had a duty to protect her against Davenport's assault. At the time of the assault, Davenport had a rape charge pending against him for an incident with another female student in a different residence hall. The district court granted KSU's motion for summary judgment. On appeal, Nero argued that

"KSU took charge of Davenport and was under a duty to exercise reasonable care to control him and prevent him from physically harming others because the university knew or should have known he was likely to cause such harm. The legal basis for argument is Restatement (Second) of Torts § 315(a), 319 (1964)." 253 Kan. at 581.

We disagreed, holding that "KSU did not have the type of control or custody over Davenport contemplated by § 315." 253 Kan. at 582.

We have imposed a § 315 duty only in situations involving a dangerous person in a custodial setting.

Finding no direct Kansas authority supporting the existence of a § 315 special relationship between a medical doctor and patient in an outpatient setting, the Court of Appeals was "most persuaded" by two duty to warn cases cited by Calwell and Hall: *Duvall v. Goldin*, 139 Mich. App. 342, 362 N.W.2d 275 (1984), and *Myers v. Quesenberry*, 144 Cal. App. 3d 888, 193 Cal. Rptr. 733 (1983). 21 Kan. App. 2d at 739. The pivotal role played by *Duvall* and *Myers* in the Court of Appeals' opinion invites comment on the two decisions.

Alice and William Duvall were injured when their car was hit by a car driven by Hubbard, who was an epileptic. The Duvalls sued Hubbard and later, Dr. Goldin, the physician treating Hubbard, claiming Goldin owed a duty to persons on the public highway to properly treat Hubbard. Goldin had breached that duty by failing to prescribe and continue Hubbard on anti-epileptic medication and to instruct Hubbard not to drive after removing Hubbard from the medication. The trial court granted summary judgment for Goldin. The Court of Appeals of Michigan reversed, relying on: (1) § 315 of the Restatement, (2) *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976) (decedent's killer confided intention to kill decedent to therapist; therapist held to have special relationship duty to warn readily identifiable victim of patient's violent intentions), and (3) *Davis v. Lhim*, 124 Mich. App. 291, 335 N.W.2d 481 (1983) (psychiatrist held to owe duty to exercise reasonable care to protect decedent against dangerous tendencies of patient).

The *Duvall* court found a § 315 duty owing under circumstances beyond those provided in §§ 314A or 316 through 320. *Duvall* relied on the "dangerous person" theory, *i.e.*, Hubbard (who had had previous epileptic seizures) was a dangerous person when removed from his anti-epileptic medication. 139 Mich. App. at 350. *Duvall* is factually distinguishable. Rylant was not a "dangerous person." She had not been removed from medication required to prevent seizures. She told Hassan at the time she first sought treatment that she had to fight to stay awake while driving. She never told Hassan that she had fallen asleep without warning while driving. Rylant responded positively to Hassan's treatment over 37

months, although she periodically returned to see him for recurrences of drowsiness, and her medication was modified. We find no evidence in the record creating a material fact issue as to whether Hassan improperly diagnosed or treated Rylant's daytime drowsiness condition. While a person prone to an epileptic seizure without warning might be viewed as potentially dangerous to others in certain situations (such as driving), Rylant's symptoms during the time she saw Hassan did not show she posed a danger to others. While under Hassan's treatment, she had been driving for over 3 years without incident. She also knew that she should pull over if she felt drowsy.

*Myers* is also distinguishable. Myers was struck by a car driven by Hansen, who, while pregnant, was suffering a diabetic attack. Hansen had seen her doctor, who advised her that her fetus was dead and needed to be removed within 18 hours. Hansen became emotionally upset. She was advised by the doctors to drive immediately to the hospital for preliminary lab tests. The accident occurred thereafter. The *Myers* court could not tell whether the collision occurred between the doctors' office and the hospital or after Hansen left the hospital. The complaint against Hansen's physicians alleged that they had negligently failed to control her conduct by allowing her to drive to and from the hospital and failing to warn her not to drive in an irrational and uncontrolled diabetic condition. She lost control of her car while having a diabetic attack. The trial court dismissed the complaint. Relying on *Tarasoff*, the California Court of Appeal reversed. *Myers* does not reference § 315. The liability issue analysis in *Myers* is grounded on policy considerations.

"The question of negligence liability is more accurately analyzed when the word 'duty' is eliminated, with the focus solely on the issue of whether liability should be imposed. This issue, in turn, is best analyzed by determining whether public policy considerations justify making an exception to the general rule of liability." 144 Cal. App. 3d at 891.

As in *Duvall*, *Myers* reached beyond § 315 to find a special relationship and accompanying duty in the medical doctor/outpatient setting. Liability was based on the doctor's failure to warn the patient not to drive.

Section 315 liability arises from either of two special. relationships: (a) one between the doctor and the patient imposing a duty to control the patient, or (b) one between the doctor and the person injured by the patient's conduct imposing a duty to protect the injured person. The special relationship here concerns the one between Hassan and Rylant, not Hassan and Calwell and Hall. Calwell and Hall do not claim Hassan had a duty to warn them.

The Court of Appeals distinguished a line of cases cited by Calwell and Hall concerning a physician's duty to warn others of the spread of infectious diseases, stating: "The issue in the present case is not the failure of Hassan to warn the plaintiffs, but his alleged negligence in failing to warn Rylant." 21 Kan. App. 2d at 741. Section 315 says nothing about a duty to warn the person who is the active force in causing the injury. Instead, it discusses a duty to control such person or a duty to protect the injured person.

The only basis for imposing a "special relationship" duty under § 315 in this case is under the theory that Hassan's actions created a risk of harm to Calwell and Hall. Rylant already was aware of her daytime drowsiness problem at the time she first sought treatment. Rylant also knew that she should pull over if she felt drowsy while driving. There was no evidence that the medication Hassan prescribed for Rylant caused or worsened her daytime drowsiness problem. She had been taking the same level of medication for slightly over a year before the accident. "Rylant testified she was feeling fine and had no problems between August 22, 1990, and July 29, 1991." 21 Kan. App. 2d at 731. According to the PDR excerpts submitted by Calwell and Hall, Hassan's prescription levels for Elavil and Prozac were within the recommended dosages. We find no issue of material fact about whether Hassan's conduct created a risk of harm to Calwell and Hall.

We have found a duty owing under § 315(a) only in situations in which the party owing the duty did have the ability or right to control the third person causing the harm. See *Boulanger*, 258 Kan. 289, *P.W.*, 255 Kan. 827, and *C.J.W.*, 253 Kan. 1. Calwell and Hall concede that Hassan had no duty to control Rylant but rather a duty to warn.

Our § 315 analysis in *Boulanger* is applicable to the disposition of the § 315 issue here. We find no special relationship between Hassan and Rylant exists under Restatement (Second) of Torts § 315 imposing on Hassan a duty to warn Rylant not to drive. As we noted in *Boulanger*, our § 315 cases are fact specific. 258 Kan. at 304. The uncle in *Boulanger* knew of his nephew's dangerous attitude. Here Rylant knew she might become drowsy or fall asleep while driving. We held in *Boulanger* that Pol had no duty to warn the uncle of what the uncle already knew. 258 Kan. at 307. Hassan had no duty to warn Rylant of what she already knew. We acknowledge that *Boulanger* concerned the injured uncle's knowledge of the risk. Here, Rylant knew the risk of falling asleep, but she caused the injury. However, the concept that there is not a duty to warn someone of what they already know applies to both cases.

## Restatement (Second) of Torts § 324A(a)

The fact that Rylant was aware of her drowsiness and that she might fall asleep while driving also influences our duty to warn analysis under § 324A.

The Court of Appeals stated with respect to § 324A: "We also recognize that Hassan may also be liable for appellants' injuries under Restatement (Second) of Torts §324A(a). He rendered services to Rylant and might be bound to recognize that those services were necessary for the protection of third persons, namely appellants." 21 Kan. App. 2d at 748. Section 324A(a) provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm . . . ."

The initial requirement for the application of § 324A(a) is that Hassan undertook, gratuitously or for consideration, to render services to another. See *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 669, 792 P.2d 993 (1990). In treating Rylant for daytime drowsiness, Hassan met that requirement. However, examination of our

cases applying § 324A shows that merely rendering services to another does not by itself activate liability. The services rendered must be those "which [defendant] should recognize as necessary for the protection of a third person." Restatement (Second) of Torts § 324A. "In order to meet this [threshold] requirement, the evidence must show the defendant did more than act, but through affirmative action assumed an obligation or intended to render services for the benefit of another." *McGee v. Chalfant*, 248 Kan. 434, Syl. ¶ 5, 806 P.2d 980 (1991). We observed in *McGee* that "[T]he extent of the undertaking should define the scope of the duty." 248 Kan. at 442.

Hassan relies on *Gooch*, 246 Kan. 663, and *Anderson v. Scheffler*, 248 Kan. 736, 811 P.2d 1125 (1991). In *Gooch* and *Anderson*, the defendants rendered services to others but were not held to have undertaken any § 324A duties to the plaintiffs. The defendants in *Gooch* inspecting the church that later collapsed on the plaintiffs' decedents rendered services, but those services were not rendered to the church, and defendants did not agree to be responsible for the safety of the structure. The defendant in *Anderson* rendered services to the plaintiff's employer by ordering the component parts of the conveyor system upon which plaintiff was injured. However, the defendant did not assume the obligation of designing a safe conveyor system.

In *Hanna v. Huer, Johns, Neel, River & Webb*, 233 Kan. 206, 662 P.2d 243 (1983), two ironworkers, injured when an improperly secured structural steel joist fell during construction of a shopping center, sued the architect. The ironworkers alleged the architect was contractually responsible for safety precautions on the job site and alternatively, the architect was negligent as to job site safety. The architect appealed the adverse jury verdict. The evidence showed that the architect had no contractual responsibility for job site safety. In addition, the architect did not assume such responsibilities outside the duties imposed by the contract. We reversed and remanded for judgment in favor of the architect. The architect rendered services, but not to the extent of undertaking responsibility for the safety of third parties.

We rejected a § 324A claim in *McGee*, 248 Kan. 434, which also involved a limited undertaking by the defendants. Chalfant had been drinking beer at several parties. Cooper and Lett, upon Chalfant's request, took Chalfant from one of the parties to his car. Chalfant was clearly intoxicated at the time. Later, Chalfant injured McGee in an automobile collision. McGee sued Cooper and Lett, claiming liability under § 324A. We reversed the district court's denial of summary judgment, stating:

> "After reviewing the Kansas case law and cases from other jurisdictions concerning § 324A and the duty to third persons for negligent acts of others, we conclude Cooper and Lett did not owe a duty of care to McGee. Cooper and Lett did not take control of Chalfant or intend to; they only agreed to transport Chalfant to his automobile. We hold this does not constitute such an affirmative act as to amount to the exercise of custody or control over Chalfant.
>
> "The extent of the undertaking should define the scope of the duty. Here, Cooper and Lett agreed to take Chalfant to his automobile. We find no evidence that Cooper and Lett agreed to do anything further, such as see that he got home. Thus, although Cooper and Lett had knowledge Chalfant was intoxicated, they did not undertake a duty to prevent him from driving. Therefore, Cooper and Lett cannot be held liable for the negligent performance of a task they did not agree to assume." 248 Kan. at 442.

Hassan argues that he did not undertake to protect third persons from Rylant's driving merely by virtue of agreeing to treat her for her daytime drowsiness problem. Although Hassan undertook to treat Rylant, he did not undertake to control Rylant's driving activities. Hassan also argues that his treatment of Rylant did not increase the risk of harm to Calwell and Hall. We agree. There was no evidence that Rylant was a dangerous driver during the time Hassan treated her before the accident. Hassan acknowledges that had he warned Rylant not to drive, the risk might have been decreased, but his failure to warn does not show that he increased such risk. During her deposition, Rylant was asked, "So then do I take it before the accident happened you were already aware of the fact that it was a possibility when you were driving to work or driving that you could doze off, get drowsy and doze off, didn't you, you knew that, did you not?" She responded, "Well, I would pull over, I mean common sense would say you would pull over." A warning to Rylant not to drive if she felt drowsy would simply

be telling her something she already knew. A duty to warn does not arise when the patient already knows of the danger. *Boulanger*, 258 Kan. at 307.

We decline to impose on physicians a § 324A duty to warn a patient of something the patient is already aware of. In our view, such a rule would subject physicians to liability claims from unknown third parties for the acts of patients over which physicians would have no control.

The uncontroverted evidence supports the district court's conclusion that Hassan's treatment of Rylant did not increase the risk of harm to Calwell and Hall. There was no indication that the medication caused Rylant's drowsiness. Rylant testified that the medication she took in the morning woke her up, although she was coming to a point where it would not help. Rylant's 1988 MSLT results showed she had a daytime drowsiness problem. There was nothing in Rylant's history showing either that she was subject to irresistible sleep attacks present with narcolepsy or that Hassan should have foreseen that Rylant would suddenly lose the ability to anticipate falling asleep while driving. Although she felt drowsy at times at work, Rylant never "just fell asleep like I did that morning [of the accident]." Hassan had successfully treated her drowsiness problem for 3 years, and she had never before fallen asleep in the daytime without warning. Even in the accident, she had the warning of feeling drowsy beforehand.

The Court of Appeals acknowledged Hassan's argument that his treatment of Rylant did not increase the risk of harm to Calwell and Hall and discussed three cases on that issue: *Flynn v. Houston Emergicare, Inc.*, 869 S.W.2d 403 (Tex. App. 1993); *Joy v. Eastern Maine Medical Center*, 529 A.2d 1364 (Me. 1987), and *Wilschinsky v. Medina*, 108 N.M. 511, 775 P.2d 713 (1989). 21 Kan. App. 2d at 745-48.

*Flynn, Joy,* and *Wilschinsky* are distinguishable. All three involved situations in which the patient was in a car accident almost immediately after seeking medical treatment at a doctor's office or emergency room. In *Flynn*, there was no evidence that the treatment received impaired the patient's driving ability, and no third-party duty was imposed. In *Joy* and *Wilschinsky*, there was evi-

dence that the treatment impaired the patient's driving ability, and a third-party duty was imposed. The *Wilschinsky* court limited its holding to plaintiffs injured by a patient driving from a doctor's office after the patient had just been injected with drugs known to affect judgment and driving ability. 108 N.M. at 515. We are not dealing here with a "leaving the doctor's office" case.

Rylant last visited Hassan 9 days before the accident. At that visit, Hassan continued Rylant on the same medication she had been taking for the previous year and advised her on her diet and sleeping habits. After that visit, Rylant did not experience daytime drowsiness until 2 days before the accident. She did not call or see Hassan during those 2 days. She had been experiencing dizziness and vertigo the week before the accident and had seen another doctor for a virus in her inner ear. She had been driving for more than 3 years with no complaints of drowsiness while at the wheel. Her only mention to Hassan of a driving concern was during the initial June 1988 consultation. There is no evidence that Hassan's treatment of Rylant or his failure to warn increased the risk to the driving public.

The Court of Appeals saw Hassan's failure to warn Rylant as raising a question of fact, apparently relying upon *Joy*. In *Joy*, plaintiff was injured in an automobile accident with Marston who was wearing an eye patch. Just before the accident, Marston had been treated for an eye abrasion at an emergency room, where the eye patch was applied. The treating physician failed to warn the patient not to drive with the eye patch. However, in *Joy*, the patient's treatment (the eye patch) created the driving impairment, and there was no evidence establishing that the patient knew the eye patch was an impairment to driving. The *Joy* court based its holding on a recognized "general requirement" that "when a doctor knows, or reasonably should know that his patient's ability to drive has been affected, he has a duty to the driving public as well as to the patient to warn his patient of that fact." 529 A.2d at 1366. Here, there is no evidence that the medication prescribed by Hassan caused Rylant to become drowsy, and Rylant expressly admitted knowing through common sense that she should pull over if she felt drowsy.

Neither the uncontroverted facts nor the case law cited from other jurisdictions support the Court of Appeals' conclusion that Hassan "may" owe a duty under § 324A.

## Was There a Genuine Issue as to Any Material Fact Concerning the Question of Whether Hassan Owed a Duty to Calwell and Hall?

Calwell and Hall listed the following categories of disputed facts:

"1. The proper diagnosis of defendant's medical condition.

. . . .

"2. Whether Rylant should have been advised not to drive.

. . . .

"3. Whether Rylant should have been able to anticipate losing consciousness.

. . . .

"4. Whether the medication prescribed by Dr. Hassan would tend to alleviate Rylant's sleep disorder or exacerbate it.

. . . .

"5. Whether Rylant would have discontinued driving had she been advised to."

They assert that the district court erred in granting summary judgment because genuine issues of material fact remain. We find no evidence that Hassan's diagnosis was incorrect or that the medication he prescribed exacerbated Rylant's condition. We conclude from a review of the record that none of the other factual disputes are material to our decision. " 'In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.' " *Boulanger*, 258 Kan. at 308. Our holding also makes it unnecessary to address the district court's alternative ruling on the causation issue.

## CONCLUSION

We hold, under the facts of this case,

(1) no special relationship exists under Restatement (Second) of Torts § 315 which warranted a duty on Hassan to warn Rylant not to drive because she might become drowsy and fall asleep;

(2) Hassan owed no duty to injured plaintiffs under Restatement (Second) of Torts § 324A; and

(3) there are no material disputed facts which precluded summary judgment in this case.

Judgment of the Court of Appeals is reversed. Judgment of the district court is affirmed.